**Sharon DEWITT, Plaintiff,**

v.

**James CARSTEN, individually, in his official capacity of Sheriff of Gwinnett County, Georgia; Michael Barkhurst, individually, and in his official capacity as Under-Sheriff of Gwinnett County; and Gwinnett County, Georgia, Defendants.**

Civil No. 1:95–cv–1569–JEC.

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 9, 1996.

Loretta Jean Mirandola, Office of Loretta Jean Mirandola, Lawrenceville, GA, for plaintiff.

John Patrick O'Brien, Thompson O'Brien Kemp & Nasuti, Norcross, GA, Baylor Bateman Banks, Office of Baylor B. Banks, Atlanta, GA, Caryl B. Sumner, Gwinnett Co. Law Dept., Lawrenceville, GA, for defendants.

## ORDER

CARNES, District Judge.

The above-styled action is presently before the Court on the magistrate judge's Report and Recommendation [68] granting Defendants' Motions for Summary Judgment [21, 34, 59]. Plaintiff has filed objections [69].

The Court has reviewed the record and concludes that the magistrate judge's Report and Recommendation [68] is thorough and well-reasoned. Accordingly, the Court approves and adopts the Report and Recommendation as its opinion and order, but supplements and slightly modifies that report, as outlined below.

With regard to the claim made under the Americans With Disabilities Act (ADA), plaintiff, who was a sergeant assigned to the Gwinnett County Jail, essentially claims that her disability was extreme stress, which stress was triggered by her boss, the Sheriff, having yelled at her on one occasion six months before she requested a transfer and by having to deal with many inmates on a daily basis. She wanted a transfer to the courthouse where she would still have to interact with the Sheriff and with inmates, but as there would be fewer inmates to deal with and less interaction with the Sheriff, she felt that this position would not trigger an inordinate amount of stress. Plaintiff ultimately submitted notes from her doctor indicating that her stress level was so great that she could not perform her job at the jail, but that he believed she could perform her work if she had minimal contact with the Sheriff, her boss, and with inmates. Defendants did not transfer plaintiff to the courthouse, she never received a medical release from her doctor to return to the jail, and, after exhausting almost five months of sick and administrative leave, plaintiff was terminated.

As recounted in the magistrate judge's detailed report, the exact chronology of events was as follows. In July, 1993, the Sheriff scolded and yelled at plaintiff as a result of what he felt was her poor performance as a supervisor at the jail, particularly, in connection with a recent suicide by an inmate. During the next six months, the plaintiff continued to feel extreme distress as a result of this incident. On January 27, 1994, she first visited a psychiatrist. A week later, on February 3, 1994, she delivered to one of her supervisors a letter from her physician noting that the stressful work environment at the jail was a contributing factor in plaintiff's "recent health problems of stress and anxiety." Accordingly, the doctor recommended that "she seek a transfer to courthouse duty, at least on a temporary basis, to allow her medical problems a chance to resolve." (Mag.J.Rep. & Rec. [68] at 7–9.)

The Sheriff expressed concern that the safety of the public could be compromised if he transferred to courthouse duty a person experiencing stress and anxiety sufficient enough to trigger a doctor's note, particularly because in the courthouse, unlike the jail, plaintiff would be carrying a gun and would be under minimal supervision. Accordingly, he did not transfer plaintiff to courthouse duty, but instead allowed her to go on sick leave, indicating that she would be allowed to return when she got an unconditional release from her doctor declaring that she was fit for duty and that stress and anxiety would not affect her job performance. (Mag.J.Rep. & Rec. [68] at 10–11).

Within the first two weeks of her sick leave, plaintiff submitted a letter from her psychiatrist indicating that he believed plaintiff was "medically unable to return to her previous job duties but is medically able to return to work if a suitable, less stressful job can be made available to her." (Mag.J.Rep. & Rec. [68] at 11). The Sheriff did not consider this an acceptable release and took no action. Thereafter, plaintiff's attorney inquired why plaintiff had not been reinstated. The Sheriff responded by noting that there was "no suitable less stressful position ... available for the position of Sergeant cur-

rently available within the agency," but also indicated that he would be willing to listen to any suggestions from plaintiff as to how she could regain her fitness for duty, such as by participating in the county's employee assistance program. (Mag.J.Rep. & Rec. [68] at 12.)

Finally, on June 1, 1994, an official in the Sheriff's Office wrote plaintiff and advised her that because she had been on extended sick leave, she was required to provide a doctor's certificate updating her condition and assessment of fitness for duty. The letter also indicated that plaintiff could receive additional time off under the Family and Medical Leave Act, if she chose. Plaintiff responded through a communication from her psychiatrist indicating that she could return to work only if (1) she had minimal or no contact with the Sheriff and (2) no responsibility for the welfare of inmates. On June 17, the Sheriff's Office responded that it had no such position at a sergeant deputy sheriff's level and advised plaintiff to explore with the county other employment opportunities that would meet her medical limitations. On July 7, the Sheriff's Office, by letter, informed plaintiff that they would have to fill her vacancy and, accordingly, would have to terminate her employment with the Sheriff's Office. (Mag.J.Rep. & Rec. [68] at 12–13.)

On this same day, the psychiatrist, apparently aware that there were no available positions that involved no contact with inmates and no contact with the Sheriff, indicated that he would modify his assessment. Although only a few weeks before he had stated that plaintiff was medically unable to return to work if she had any contact with inmates, he now altered that requirement to allow minimal responsibility for the welfare of inmates. Plaintiff still could have only minimal contact with the Sheriff, her boss, in order to be medically able to perform her job. (Mag.J.Rep. & Rec. [68] at 14.)

The magistrate judge has set out in great detail the reasons why plaintiff's stress does not qualify as a disability under the ADA. This Court concurs and further observes that were such a complaint held to be actionable, it would expand the scope of the ADA well beyond the scope of illnesses that Congress has indicated it was intended to cover. That is, many employees feel stress from their jobs. Sometimes, it is because the job is inherently stressful. (Dealing with inmates would be a good candidate for an inherently stressful job). Sometimes, the job is stressful because one's boss is unpleasant or demanding or yells at his employees or because the employee just does not hit it off with her boss or co-workers. Other times, the employee simply may be ill-suited in temperament or skill for the job and this poor fit will necessarily create stress as the employee endeavors to perform a job whose demands are simply too much for her.

Plaintiff, like anyone else, would like to hold a job as stress-free as possible. Traditionally, when an employee feels that a job is too stressful, she generally has three options: she first tries to obtain a reassignment with her employer; if that is not successful, she then either finds a less stressful job somewhere else or tries to stick it out with her current position. Plaintiff argues that the ADA provides a fourth option whereby she can insist that her employer transfer her to another position and can further dictate to her employer the one particular job that she will agree to hold, as well as the conditions under which she will perform that job.

Hopefully, in many work situations, the employer is willing and able to find another job more suited to an employee's needs and skills whenever that employee has a job that is causing her to feel stress. An employer, however, is not *required* to reassign an employee to a less stressful job, absent a legal requirement to do so. This Court agrees with the magistrate judge that plaintiff's particular stress is not a disability that legally mandates the employer to reassign plaintiff or offer her another accommodation.[1]

1. Of course, the employer did accommodate plaintiff by allowing her to exhaust almost five months of sick and administrative leave in order to get herself back together emotionally. Her own doctor has said that her condition was temporary and could end within one year of "closure", with the doctor defining closure, however, as the end of this litigation or the reassignment to another less stressful position.

As discussed by the magistrate judge, in order to constitute a disability, the plaintiff must demonstrate a physical or mental impairment ·that substantially limits one or more major life activities. (Mag.J.Rep. & Rec. [68] at 18.) While a condition that would substantially limit one's ability to work could constitute a disability, this Court agrees that a condition that limits one from performing only *one* job is not a disability under the parameters set out by Congress. The reasons for Congress' limitations are readily understandable if one considers the implications of plaintiff's argument that a stress that is triggered by one job only [2]—working in a jail—constitutes a disability. A jail, which houses criminals who would like nothing better than to be outside the jail, is always going to present a stressful environment. Presumably, plaintiff was not the only employee who felt the stresses inherent in the job and who would have liked 'a more tranquil position in order to alleviate this stress. Were the job-triggered stress that plaintiff describes as a disability sufficient to require her employer to reassign her to another job, it is likely that many other jail employees, subject to the same job-related stresses, might also insist on similar accommodations, potentially leaving few employees available to work in the jail.

Moreover, sheriffs, who oversee a dangerous and stressful paramilitary type organization, may sometimes be demanding and even intimidating in their supervisory style.[3] Were an employee able to demand reassignment merely because her boss creates stress, entire business offices could go unstaffed. Maybe such a result would be a good thing, because if an employee can demand reassignment whenever he has an overbearing supervisor, then supervisors would have to treat their employees more kindly; maybe such a result would be bad, because supervisors would no longer be able to manage effectively, without fear of constant demands for transfer by their increasingly hypersensitive employees. Whatever the policy ramifications would be if plaintiff's argument were successful, this Court agrees with the magistrate judge that, under the standards set out by Congress, this plaintiff's condition does not constitute a disability under the ADA.

Moreover, plaintiff's stress was a very flexible sort of disability. Not seeking a totally different kind of position, such as a clerical position,[4] plaintiff wanted to remain in the Sheriff's Office as a sergeant and, in fact, insisted on a job that, itself, carried the same sort of stresses as the job she considered herself disabled to hold, albeit the coveted position held, in plaintiff's mind, a lesser degree of stress. Thus, on courthouse duty, plaintiff would still have had to deal with the Sheriff and with inmates:[5] the two types of interaction that caused her "disability" to begin with.

2. Plaintiff determined that courthouse duty, which also required interaction with inmates and the sheriff, would not be sufficiently stressful to trigger her disability, as the contact with both would be less in the courthouse. She also apparently considered work as a police officer not to be so stressful as to aggravate her disability, as she applied for a position with defendant Gwinnett County's police department eight months after her termination from the sheriff's office and was hired, but was unable to assume the position as she failed one portion of her physical fitness exam. Finally, she also must have concluded that a clerical position would not be too stressful, because she applied for and received a position with the records section of defendant's police department, a position that she held until at least March, 1996.

3. The Court, of course, does not endorse a managerial style in which a supervisor bullies subordinates or behaves unprofessionally. The appropriateness of the Sheriff's alleged conduct is not before ·the Court, however. Indeed, federal courts do not frequently assess particular managerial styles.

4. Plaintiff did ultimately seek and receive from defendant Gwinnett County a clerical position that she held until the close of the evidence in this case and may still be holding.

5. Moreover, notwithstanding plaintiff's preference for ·this job, the Court questions whether dealing with inmates in a courthouse setting is substantially less dangerous. than interacting with them in a jail. In a courthouse, the deputy must transfer the inmate from a confined place to an open place, where there are vulnerable civilians. In a jury setting, the deputy cannot generally restrain the inmate/defendant with handcuffs and, while always zealously watching the inmate to insure against an assault or an escape attempt, must not give the appearance to the jury that the inmate poses any danger.

Indeed, the causal relationship between the job and her claimed "disability" distinguishes plaintiff's stress from other conditions that clearly constitute disabilities under the ADA. After all, a visually impaired person will be visually impaired no matter what job he holds; a quadriplegic will be unable to walk whether or not he is employed. Plaintiff's "disability," however, was triggered only when, out of the universe of hundreds of jobs,[6] she held a very specific job in the jail that required a lot of interaction with inmates and with the Sheriff. According to plaintiff, this disability would not be triggered if plaintiff had a job that required less interaction with these individuals.

In addition, although the magistrate judge did not address the issue of plaintiff's qualification to hold the courthouse job,[7] defendant's position on that issue is well-founded. By having a doctor inform the defendant that plaintiff suffered from an emotional condition that made it, not just difficult, but *medically impossible* for her to function in a setting in which she would have to interact regularly with inmates or the Sheriff, plaintiff made it hard for a responsible sheriff, whose job is to insure public safety, to transfer her to another job that also required working with inmates and interacting with the Sheriff, albeit to a lesser degree. Had the Sheriff transferred plaintiff to the courthouse and had she suffered a breakdown or performed poorly in a situation in which someone was injured by an escaping inmate or in which, now armed with a gun, she used excessive force against an inmate, it is likely that a different plaintiff would now be in court suing the Sheriff for his negligence in assigning this plaintiff to such a job. *See also, infra* at 19–21.

In short, the Court agrees completely with the magistrate judge's determination on the ADA claim. Upon initially reviewing the

magistrate judge's Report and Recommendation, however, the Court considered plaintiff's claim of sex discrimination to be more substantial and accordingly has also scrutinized carefully the pleadings and record in regard to this claim. That is, an employer may not be required to transfer a stressed, dissatisfied employee. The Court will assume, for purposes of this discussion, however, that if an employer is willing to transfer unhappy male employees, he must be similarly empathetic to unhappy females, else subject himself to a claim of sex discrimination. Upon this review of the record, however, the Court likewise concurs with the magistrate judge's conclusion that plaintiff has not made out a claim of sex discrimination.

In attempting to establish her *prima facie* case, plaintiff presents her own affidavit, which names five men who were transferred to the Courthouse, effective June 6, 1994, and which describes health problems that some of these men purportedly had, which problems plaintiff contends to have prompted their transfers. In essence, plaintiff contends that these men are appropriate comparators and that she was treated in a disparate and harsher manner than were they.

■ First, summary judgment for defendants is warranted on this claim because plaintiff's "evidence" does not come even close to meeting the requirements of Rule 56. That rule requires that "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED.R.CIV.P. 56(e).

Instead, without mentioning the basis for her "personal knowledge" of the dates and reasons for other employees' transfers, plaintiff simply asserts:

---

**6.** As noted in n. 4, plaintiff, herself, believed that she was able to hold three other jobs with defendant Gwinnett County and actually was hired for two of these jobs by defendant. Her complaint in this action is that because she did not receive the job that she most wanted—a sergeant deputy sheriff's position at the courthouse, as opposed to the jail—defendants have violated the Americans with Disabilities Act.

**7.** He did discuss the issue of her qualification for the courthouse position in the section of the Report addressing the Title VII (sex discrimination) claim. *See* Mag.J.Rep. & Rec. [68] at 31–32. The magistrate judge also did not address defendants' argument that, even assuming plaintiff's stress constituted a disability, defendants provided a reasonable accommodation by giving her five months leave and by ultimately offering her two other positions, albeit not the position she most wanted, with the County.

Positions were available at the courthouse in June 1994. Effective June 6, 1994, Deputy Cheryl Morrissette was transferred from the jail to the Courthouse after she complained of unfair racial treatment. Effective June 6, 1994, Sergeant Robin Seymour was transferred from the jail to Field Operations and an administrative position for 'restructuring' purposes.

I was refused the transfer to the Courthouse which I repeatedly requested on and after October 18, 1993, and which my doctors advised. Five male deputies were transferred to the Courthouse effective June 6, 1994. Dillard Hughes (white male) was transferred due to heart problems Alton Hobbs (white male) was transferred because he had problems working in the jail due to stress. Richard Childs (white male) was transferred due to heart problems. John Irvine (black male) and John Yeary (white male) were transferred for no apparent reasons.

(Pl.Aff. at ¶¶ 25 and 26.)

Clearly, plaintiff has failed to show that she is competent to make the above assertions. She does not claim to have been the supervisor of any of these employees nor to have been involved in the decision making process regarding the transfers of these employees. How does plaintiff know that Alton Hobbs was transferred because he had stress problems? Did he tell her? Did the Personnel Director inform her? Did she hear this report through office gossip? She gives no clue. Moreover, plaintiff was not without recourse to establish that these transfers occurred for the reasons she cites. She had ample opportunity to discover information related to the transfers of the individuals she names. She could have subpoenaed information regarding their transfer or deposed these individuals. The Court has, itself, read the 163 page deposition of the Sheriff and the deposition of the Human Resources Director to determine if plaintiff inadvertently omitted information concerning the transfer of these alleged comparators and has discovered no questions concerning this issue.

The Eleventh Circuit has recently made clear that although *otherwise admissible* evidence may be submitted in *inadmissible* *form*, such evidence should not be considered in deciding a motion for summary judgment when there is no indication that the evidence can be reduced to admissible form or, specifically, no indication that a witness with personal knowledge will testify at trial consistently with the assertion. *McMillian v. Johnson*, 88 F.3d 1573, 1584–85 (11th Cir. 1996) (emphasis in original).

Here, there is no assurance that a witness with personal knowledge will testify consistently with plaintiff's proffer. Accordingly, all plaintiff offers on this point is assertions, but no evidence. In addition, this omission is more than a technical point. Specifically, plaintiff cannot be arguing that sex discrimination occurred as a result of defendant's willingness to transfer men, but not women, out of jail duty. She cannot be making such an argument because her own assertion reveals that the defendant transferred two women at the same time he transferred the named men. Instead, her argument must be that defendant transfers men who seek reassignment based on health reasons, but not women. That comparison being limited to a very narrow factor, it is important for the plaintiff to offer something more than an assertion about the circumstances of the transfer.

▪ Second, even if the Court were to accept plaintiff's assertions in her affidavit as competent evidence, plaintiff still would be unable to survive defendants' summary judgment motion regarding this claim of sex discrimination. In order to establish her prima facie case, plaintiff must show that (1) she is a member of a protected class; (2) she applied for the transfer and was qualified for the position to which she sought to be transferred; (3) she was rejected despite her qualifications; and (4) other equally or less qualified employees who were not members of the protected class were transferred. *Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir.1988), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989). (*See also* Mag. R & R [68] at 31.)

Plaintiff clearly was a member of a protected class and did apply for a transfer. The magistrate judge states that "it is a matter of dispute as to whether the plaintiff

was, from an objective standpoint, 'qualified' to serve as a sergeant on courthouse duty when the defendant initially denied her transfer request ... [as] the defendant initially denied the plaintiff's request for a transfer long *before* it learned of [her] restrictions...."

While the magistrate goes on to dispose of the matter in defendant's favor anyway, some discussion is warranted on the above point. In the above quote, the magistrate judge is apparently referring to an alleged request for a transfer by plaintiff, purportedly made to a supervisor in October, 1993, a few months before plaintiff began submitting the doctors' letters indicating that she was too stressed to perform her job. The evidence is fuzzy on this point and somewhat disputed, but the Court will assume that such a request was made and denied. The Court finds that plaintiff's evidence of denial of a transfer request at this time fails to raise an inference of discrimination, even if defendant was initially unaware of plaintiff's limitations,[8] because she has not shown that, *at the time of her original request*—or at any time before June 1994 for that matter—other individuals were transferred into the position she

desired at the Courthouse or that there were in fact any openings at the courthouse.[9] The only assertion made by plaintiff regarding the availability of transfers is: "Positions were available at the courthouse in June 1994." (Pl.Aff. at ¶ 25.) No mention is made of transfers that occurred prior to June. Thus, defendant's decision to deny her request in October does not create an inference of sex discrimination given these circumstances because whether she was qualified at that time is irrelevant in the absence of an available courthouse position: the only position plaintiff has ever indicated that she requested or wanted.[10] No further analysis is necessary with regard to the denial of plaintiff's early requests for a transfer, because she has failed to establish the fourth prong of her *prima facie* case: that others outside the protected class were transferred before June of 1994.

With regard to the denial of her specific request for a transfer to the courthouse, accompanied by doctors' notes, in February–July, 1994, it is clear that transfers of men and women from the jailhouse to the courthouse were made at that time. Even assuming that plaintiff's affidavit constitutes evi-

---

8. Plaintiff's subsequently announced limitations, in effect at the time transfers were made on June 6, 1994, was that she could have *no* responsibility for the welfare of inmates and minimal or no contact with the Sheriff.

9. Defendant Carsten testified at his deposition that, "Transfers are done on a recommendation from a division commander because of a needs assessment for manpower allocation...." He also explained:

> If the employee requests a transfer, that goes into a transfer request and it's considered as manpower needs become available or a position becomes available.... I can have a plethora of transfer requests that come to my secretary and she puts them in a generic folder. Every year we put out the requests and then, from time to time, we transfer people as the spaces become available or need assessments or recommended by division command. It's not just an arbitrary—maybe I can qualify this. It's not an arbitrary that somebody comes up to my door and says, Sheriff, here is my transfer request, would you stamp this, I would like to leave and go someplace else. It's a very complex administrative review.

(Carsten Depo. at 31, 35, 37.) In addition, when asked by plaintiff's counsel: "Do you not consider individual employees requests when the trans-

fer requests in this complex thing crosses your desk?", Carsten replied, "Well—but I just answered that all transfer requests are considered and reviewed, but nothing is implemented until there is a need assessment." (*Id.* at 38.)

Plaintiff uses defendant Carsten's deposition to suggest that defendant could have put plaintiff in the Courthouse based on her medical needs, as it had moved other employees in the past based on their particular needs. (*See* Pl.Resp. to Def.Mot. for Sum.J. [63] at 6.) While it is true that *reassignments within a division* can occur for such reasons, it is up to the individual division commander to make that decision. (Carsten Depo. at 33.) Transfers, however, according to his testimony, are handled by Carsten and are consummated as positions come available. (*Id.*)

10. The magistrate judge stated that a transfer request "is not an application for a discreet job opening." (Mag.J.Rep. & Rec. [68] at 31.) While that may sometimes be the case, in this situation, plaintiff appeared to make a specific request to be transferred to the Courthouse. (See Dewitt Depo. at 208 (explaining that she and her doctor determined she could still work as a sergeant if she were assigned a small detail, like those at the Courthouse.)) Indeed, her doctor, with her input, made such a request on her behalf.

dence that men were transferred to the courthouse when they had medical problems, the affidavit does not show that these men were comparators to plaintiff in terms of their qualification for the courthouse position. Specifically, at the time positions at the Courthouse were open, defendant was undeniably aware of the medical restrictions laid down on plaintiff by her doctor: she could have no responsibility for the welfare of inmates[11] and minimal or no contact with the Sheriff.

It was and is the position of the Sheriff that, even at the courthouse, he could not insure that a deputy would have no responsibility for the welfare of inmates and that this limitation on plaintiff, at the least, made her a less desirable candidate for courthouse duty than another employee, whether male or female, who suffered no such restrictions. Plaintiff has not demonstrated that any of the male employees were being treated by a doctor who restricted them from dealing with inmates or who felt that their physical or emotional condition was so fragile that, as a medical matter, they could not function in a job that required much interaction with inmates or with their own boss. Accordingly, even accepting plaintiff's affidavit as competent evidence, this affidavit does not show the transferred male employees to be appropriate comparators to plaintiff.[12]

The above discussion also relates to another failing in plaintiff's *prima facie* case: her failure to demonstrate that she is qualified for a courthouse position, given her limitations. As noted, it has been defendants' position since plaintiff requested the transfer on medical grounds that, with the doctor's restrictions on plaintiff's duties, she is not qualified for the courthouse position. Plaintiff argues that defendant has not proved that she was not qualified for the courthouse duty. It is not defendant's burden, however, to disprove plaintiff's qualifications, but her burden to prove her qualifications. Given that at the time of the transfers of the named men, plaintiff was under doctor's orders to have no responsibility for the welfare of inmates, she has not demonstrated how she would be qualified for a job that requires such responsibilities.[13]

Moreover, plaintiff's doctor also limited her to minimal or no contact with the Sheriff. Plaintiff testified at her deposition that she was still afraid of Sheriff Carsten. (*See* Dewitt Depo. at 208.) Given that plaintiff has expressed her continued fear of the Sheriff and that she would have some contact with him, even at the courthouse, this limitation also renders plaintiff unqualified for the position. As with any CEO, it is up to the Sheriff to be the ultimate arbiter of employment decisions and discipline. He can scarcely perform his job fully if he is forbidden to interact with a particular employee. Nor can an employee who seeks to dictate to her employer how much interaction he can have with her be said to be qualified for her position.

**11.** After the transfers had been made and plaintiff was terminated, the psychiatrist modified his restrictions to indicate that plaintiff could have minimal responsibility for the welfare of inmates.

**12.** Sometimes, discussion of the prongs of the *prima facie* test overlaps with the consideration of the employer's legitimate non-discriminatory reason for the adverse employment action. Thus, even if plaintiff could be said to have met the prima facie test, defendants have offered a legitimate non-discriminatory reason for not transferring her—her substantial limitations in performing the position—and plaintiff has not offered evidence of pretext.

**13.** Even considering the July 1, 1994 letter of the psychiatrist, coming on the day of plaintiff's termination, but after the other men and women had been transferred to the courthouse, indicating that plaintiff could have minimal responsibility for the welfare of inmates, she has not demonstrated, as opposed to asserting, that courthouse duty would meet that criterion nor has she offered evidence other than her own assertions that such duty is less stressful. If, for example, plaintiff were on courthouse duty on an arraignment day, charged with the responsibility of getting inmates from holding cells to the courtroom, how many inmates could she deal with before the medical restrictions limiting to minimal her responsibility for inmates' welfare kicked in? Five? Ten? If five inmates were her limit and on some days she would have to deal with more than that number, then she would not be qualified by the very limitations placed upon her by her psychiatrist. Plaintiff has not, however, stated the qualifications for the courthouse position or fleshed out exactly the extent of her restrictions or how these restrictions would interact with the stated job duties, as is her burden.

Plaintiff essentially skips over the qualification prong of the analysis, however, and instead attempts to show sex discrimination merely by pointing to the fact that she was not transferred in June of 1994 while five men were. She notes that two had heart problems, one was experiencing stress, and two were transferred "for no apparent reason." Moreover, it appears that she believes that the two women who were transferred were reassigned for reasons other than health considerations. Again, to the extent that plaintiff is arguing gender discrimination generally as a result of the transfer of these men, the simultaneous transfer of two women to courthouse duty defeats her argument.[14] Accordingly, for these additional reasons, the Court finds that plaintiff has failed to establish her prima facie case of sex discrimination regarding defendant's denial of her transfer request.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendants' Motions For partial Summary Judgment [21, 34, 59].

---

**14.** Although plaintiff states that these women were not transferred due to stress or other health problems (*see* Dewitt First Aff. at ¶¶ 25–26.), the fact that they were transferred indicates that defendant, as an initial matter, is not basing its transfer decisions on the gender of the individual requesting the transfer. In other words, it belies common sense to argue that defendant is discriminating against plaintiff because she is a woman, albeit a woman with certain restrictions, when it has transferred other women to the position plaintiff desires. Indeed, it appears that plaintiff is attempting to create a new protected class of individuals—women with health problems. The Court has already determined that plaintiff is not a qualified individual with a disability as defined under the ADA. Whether such a narrow protected class would be otherwise recognized is unclear. For purposes of this discussion, however, the Court has assumed that such a class would be sustainable.