Argued and submitted March 2, affirmed August 30, 2000

# CENTENNIAL SCHOOL DISTRICT NO. 28J,
### *Petitioner,*

*v.*

# OREGON BUREAU OF LABOR AND INDUSTRIES
## and Dennis W. Frederick,
### *Respondents.*

## (09-99; CA A106193)

10 P3d 945

Nancy J. Hungerford argued the cause for petitioner. With her on the briefs were Brian Hungerford and The Hungerford Law Firm.

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for respondent Oregon Bureau of Labor and Industries. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

No appearance for respondent Dennis W. Frederick, *pro se*.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

HASELTON, J.

## HASELTON, J.

Employer, Centennial School District No. 28-J (District), appeals from a final order of the Commissioner of the Bureau of Labor and Industries (Commissioner) requiring it to pay damages for engaging in an unlawful employment practice when it denied an employee leave under the Oregon Family Leave Act (OFLA). ORS 659.470 *et seq.* The District asserts that the Commissioner erroneously construed the applicable law in determining that complainant suffered from a "serious health condition" and was unable to perform an "essential function" of his job because of that alleged serious health condition. ORS 659.476(1)(C). Alternatively, the District contends that the Commissioner's award of $25,000 as damages for mental suffering caused by the District's unlawful conduct was not supported by substantial evidence in the record. We affirm.

The material facts, as found by the Commissioner,[1] are as follows: In March 1993, complainant began working part-time for the District as a custodian. In 1995, he assumed a full-time position at Centennial Middle School. In July 1996, the District reassigned complainant to divide his work days evenly between Pleasant Valley Elementary School and Lynch Meadows Elementary School. That reassignment was due to the District's "budget shortfall and * * * need to reduce the work force."

Complainant found the work environment at Pleasant Valley to be team-oriented. In his view, despite the cutbacks, everybody who worked there understood that the school district did not have enough custodians, and they cooperated to do the best they could with the resources available. Conversely, complainant perceived the work environment at Lynch Meadows to be difficult. For example, on one occasion, complainant was working extra hours at Lynch Meadows to prepare for an open house, a coworker required him to assist her with her duties before he performed his own. Consequently, complainant had insufficient time to complete his

---

[1] Except as specifically noted, District does not dispute the Commissioner's findings of historical fact.

own assignments, and the following day he was reprimanded. From that time forward, complainant felt that no spirit of teamwork or cooperation existed at Lynch Meadows. Complainant discussed his concerns with his supervisor. However, complainant did not feel that his supervisor appropriately handled the problem and, because complainant took his work seriously, this greatly upset him.

Shortly after complainant was reprimanded, a field representative for the Oregon School Employees Association informed Charlene Harris, the District's Director of Human Resources, that complainant believed that his workload at Lynch Meadows was too heavy. Harris and the Lynch Meadows principal met with complainant and told him that they had high expectations but understood that the custodians would not be able to accomplish everything they had in previous years.

After those events, complainant's mental state was "not good at all." He believed that he was being penalized for the downsizing of custodial staff. When he discussed the increased workload, he was called a "whiner." As a result of his conflicts with other staff at Lynch Meadows and meetings about those conflicts, complainant became depressed and frequently contemplated suicide. He could not sleep through the night and had anxiety attacks. He suffered chest pains, shortness of breath, and vomiting. Complainant sometimes cried when he called his wife during his breaks at work.

On Tuesday, October 8, 1996, during a stressful meeting with a union official, complainant became progressively ill. Later that day, complainant visited his family physician, Dr. John Loomis. Loomis called Eric Mueller, a clinical psychologist, and scheduled an appointment for complainant. Mueller saw complainant that same day and continued to counsel complainant weekly thereafter for stress and severe depression. Additionally, Mueller recommended that complainant be put on an antidepressant, which Loomis prescribed.

Complainant missed several days of work following the October 8 meeting. On October 15, 1996, Harris sent complainant a letter that stated, in part:

> "This letter is to inform you that you are eligible for medical leave under the [federal] Family Medical Leave Act of 1993, and the Oregon Family Leave Act due to a 'serious health condition.' OFLA and FMLA entitle you to take up to 12-weeks of unpaid (paid if you choose to use your accrued sick leave), job-protected leave in a 12-month period."

The next day, Mueller informed the District that complainant would be returning to work only at Pleasant Valley but not at Lynch Meadows.

On October 17, 1996, complainant gave the District a completed application form for family medical leave. On that form, complainant indicated that he needed the leave to obtain "rehabilitative counseling" for his "severe depression." Complainant indicated that the leave was "from Lynch Meadows School only" and that he was "released to work at Pleasant Valley." Complainant began taking leave that day, working only his half-day four-hour shift at Pleasant Valley.

The District subsequently sent Mueller an FMLA "Certification of Health Care Provider" form. That form asked whether the employee's condition fell within any of several categories of "serious health conditions." Among those categories was "Absence Plus Treatment" which the form defined as:

> "a. A period of incapacity * * * of more than three consecutive calendar days (including any subsequent treatment or period of incapacity * * * relating to the same condition), that also involves:
>
> "(1) Treatment * * * two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
>
> "(2) Treatment by a health care provider on at least one occasion which results in a regiment of continuing treatment * * * under the supervision of the health care provider."

The form further provided that the term "incapacity" meant "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom."

On October 31, 1996, Mueller returned that form, indicating that complainant's condition was a serious health condition within the "Absence Plus Treatment" category. More particularly, Mueller stated that complainant had major depressive symptoms that could take approximately four to six months to resolve with treatment, including counseling, medication, and resolution of work stress. Mueller further stated that, despite complainant's depression, he could work part-time "in a low stress setting."

Between October 16, 1996 and January 22, 1997, complainant worked half-day shifts at Pleasant Valley only and refused to work at Lynch Meadows. In December and January, complainant and District personnel participated in mediation sessions regarding work conditions at Lynch Meadows and, particularly, complainant's relationship with his coworkers.

Although the mediation efforts proved unsuccessful, on January 16, 1997, Mueller wrote to Harris stating that complainant was ready to return to work six hours per day and that Mueller was releasing complainant to work a total of six hours: four hours at Pleasant Valley and two hours at Lynch Meadows. Harris, however, believed that complainant was capable of working his entire four-hour shift at Lynch Meadows rather than the two hours Mueller recommended. She also believed that complainant was not entitled to OFLA leave because, in her view, he did not have a "serious health condition"—*i.e.,* she believed that his difficulties related more to a personality conflict than to an illness. Consequently, on January 16, 1997, she wrote to complainant:

"Since your FMLA has expired and the District has not received from your treating physician a release to full time duty, effective Wednesday, January 22, 1997, you will be working four (4) hours per day at Lynch Meadows Elementary School.

"If the District does not receive a release from your doctor for full time duty by January 22, 1997, your four hour job

will become your permanent position at [the District]. You will need to report to Lynch Meadows at your normal work time on January 22, 1997.

"If we do receive a release for full time duty from your physician, you will return to your eight-hour position, four hours at Pleasant Valley and four hours at Lynch Meadows Elementary School. You would then retain your regular work hours at both sites."

Complainant did not report to work at Lynch Meadows on January 22 in accordance with the District's conditions. Mueller did not release complainant to full-time work. The District thereafter terminated complainant's employment.

In October 1997, complainant filed a complaint with the Civil Rights Division of the Bureau of Labor and Industries (BOLI), alleging that the District had "failed to provide reasonable accommodations for [his] disability and refused to allow [complainant] to utilize [his] family medical leave." Specifically, complainant alleged that the District had unlawfully terminated his employment because of his disability and because the District had erroneously concluded that he had exhausted his 12 weeks of OFLA leave.

BOLI investigated those allegations and found substantial evidence of unlawful employment practices and, specifically, a violation of the OFLA. The investigation concluded that, although the District had granted 12 weeks of leave, commencing October 17, 1996, under the OFLA's "intermittent leave" rules, ORS 659.478(6) and OAR 839-009-0210(11), complainant had exhausted only half of his entitlement to OFLA leave. More particularly, the investigator explained that 12 weeks of leave equated to 480 hours of leave entitlement and because "[c]omplainant took four hours off each day, not eight" at the time the District "demanded that complainant return to full-time work" complainant remained entitled to 240 hours of leave. Consequently, the investigator concluded, the District had terminated complainant "at a time when he still had a right to be off work four hours a day and not * * * work at Lynch Meadows School."

On October 15, 1998, BOLI filed Specific Charges against the District, seeking damages on behalf of complainant. The District responded, denying the allegations and asserting that complainant did not qualify for leave under the OFLA at the time he was discharged. The District conceded that the method BOLI had used to calculate complainant's entitlement to leave was correct and that, if complainant otherwise was eligible for OFLA leave, complainant had 240 hours of leave remaining at the time he was terminated. The District contended that complainant was not eligible for OFLA leave because complainant's condition was not a "serious health condition" for purposes of the OFLA and that his condition did not render him "unable to perform at least one of the essential functions of [his] regular position." ORS 659.476(1)(c).

Ultimately, following contested case proceedings, the Commissioner adopted the administrative law judge's determination that the District had violated the OFLA by allowing complainant to take only half of the 480 hours of leave to which he was entitled. The Commissioner determined particularly that complainant's depression qualified as a "serious health condition" and that the condition had "caused him to be unable to perform at least one of the essential functions of his regular position—being present at Lynch Meadows Elementary School to perform janitorial duties." The Commissioner reasoned:

"Complainant's depression caused him to be unable to work at Lynch Meadows Elementary School, although he could work at Pleasant Valley. * * *

"* * * * *

"Respondent asserts * * * that complainant did not suffer a serious health condition. [The District's] argument is based on its contention that it is not bound by the [BOLI] policy statement [interpreting that term]. That contention has no merit. [BOLI] properly has interpreted the statutory term 'serious health condition' to include 'an illness, injury, impairment, or physical or mental condition that requires constant care * * *, including * * * inability to work for more than three consecutive calendar days and 2 or more treatments by health care provider or one treatment plus

continuing supervision by health care provider.' Complainant was unable to work for more than three days because of his serious depression and sought ongoing treatment from * * * Mueller and * * * Loomis through the remainder of his employment by [the District]. His depression, therefore, qualified as a 'serious health condition.'

"Complainant's depression also caused him to be unable to perform at least one of the essential functions of his regular position—being present at Lynch Meadows Elementary School to perform janitorial duties. Mueller informed [the District] several times that complainant was *unable* to work four hours per day at Lynch Meadows. Because complainant could not be present at Lynch Meadows, he could not perform the function for which the position existed—to clean and maintain the *Lynch Meadow* facilities.

"* * * * *

"If that were not the case, [the District] would not have terminated complainant from that position when he became unable to provide services at Lynch Meadows—instead, it would have transferred him to another facility." (Emphasis in original; citations and footnote omitted.)

The Commissioner's order awarded complainant $7682.40 in lost wages and $25,000 as damages for mental distress suffered as a result of the District's unlawful employment practice. ORS 659.470 *et seq.*; OAR 839-009-0210.

On review, the District assigns three errors to the Commissioner's order: (1) The Commissioner erred in determining that the District violated ORS 659.478 when it denied complainant leave from his position. Specifically, the Commissioner erred in construing and applying both "serious health condition" and "essential function" of employment within the meaning of ORS 659.476(1)(c). (2) The Commissioner violated ORS 183.335 by adopting a new rule defining "serious health condition" without first engaging in the required rulemaking procedure, or without previously announcing the decision through a contested case proceeding. (3) The Commissioner's award of $25,000 in damages for mental suffering was not supported by substantial evidence in the record.

Because we have never before construed the OFLA we begin with some basic background. Under the OFLA, employers with 25 or more workers must provide eligible employees 12 weeks—480 hours—of unpaid leave a year in the event that a "serious health condition of the employee * * * renders the employee unable to perform at least one of the essential functions of the employee's regular position," or where it is necessary for an employee to care for family members with serious health conditions, to care for an "infant or newly adopted * * * [or] foster child," or to care for a child with a nonserious illness that requires home care. *See* ORS 659.476; *Civil Rights Laws: A Handbook for Oregon Employers* (1998 Bureau of Labor and Industries). The employer may require medical verification from a health care provider of the need for the leave, and may require an employee to obtain the opinion of a second health care provider designated by the employer, at the employer's expense.[2] ORS 659.482. The OFLA also provides for "intermittent" leave, which allows an employee to take leave intermittently when it is medically necessary, thus, potentially extending the period of leave beyond 12 weeks when leave taken is less than full-time. ORS 659.478(6).

ORS 659.492(1) provides that a covered employer who denies OFLA leave to an eligible employee commits an unlawful employment practice. An employee claiming to be aggrieved by such a practice may file a complaint with the Commissioner of the Bureau of Labor and Industries, who has the authority to enforce the provisions of the OFLA. ORS 659.492(3). Alternatively, the employee may file a civil action in circuit court. ORS 659.121.

The federal counterpart to the OFLA is the Family Medical Leave Act of 1993 (FMLA), 29 USC § 2601 *et seq.* The FMLA applies to employers with 50 or more employees and, with some exceptions, provides substantially similar protections as those provided by the OFLA. If an employee is covered under both the OFLA and the FMLA, leave time can be

---

[2] In addition to creating substantive rights to leave, the OFLA provides job protection to employees upon returning to work, including, with some exceptions, restoration to the position of employment held by the employee when the leave commenced. *See* ORS 659.484.

counted against both the federal and state entitlements. Given the similarities between the two acts and the potential that leave may be covered under both the federal and state acts, the Oregon Legislature expressly provided that the OFLA provisions "shall be construed to the extent possible in a manner that is consistent with any similar provisions of the [FMLA]." ORS 659.494(2).

As noted, the Commissioner determined that complainant was entitled to OFLA leave under ORS 659.476(1), which provides:

"(1)   Family leave under [the OFLA] may be taken by an eligible employee for any of the following purposes:

"* * * * *

"(c)   To recover from or seek treatment for a *serious health condition* of the employee that renders the employee unable to perform at least one of the *essential functions of the employee's regular position*." (Emphasis added.)

In its first assignment of error, the District asserts that the Commissioner's determination of a statutory violation must be reversed for any of three reasons: (1) Complainant did not have a "serious health condition" within the meaning of ORS 659.476, and the Commissioner's contrary conclusion was based on a misconstruction of that statutory term. (2) Complainant's inability to work at Lynch Meadows did not implicate an "essential function" of his position. (3) In all events, there was no causal nexus between any "serious health condition" within the meaning of ORS 659.476 and complainant's inability to work at Lynch Meadows. We consider, and reject, each in turn.

ORS 659.470(6) defines "serious health condition" as:

"(a)   An illness, injury, impairment or physical or mental condition that requires inpatient care in a hospital, hospice or residential medical care facility;

"(b)   An *illness, disease or condition that in the medical judgment of the treating health care provider* poses an imminent danger of death, is terminal in prognosis with a reasonable possibility of death in the near future, or *requires constant care*; or

"(c) Any period of disability due to pregnancy, or period of absence for prenatal care." (Emphasis added.)

Here, in concluding that complainant's depression was a "serious health condition," the Commissioner relied on a BOLI policy statement defining "serious health condition" as:

"3. an illness, injury, impairment, or physical or mental condition that requires constant care (ORS 659.470(6)(b)). Constant care means care wherever performed (OAR 839-009-0210(10)), including:

"* * * * *

"c. inability to work for more than three consecutive calendar days and 2 or more treatments by health care providers or one treatment plus continuing supervision by health care provider."

The District contends that the Commissioner erroneously relied on that policy statement—and particularly its definition of "constant care"—because, *inter alia,* it was taken from a *federal* regulation, 29 CFR § 825.411, which defines the term *"continuing treatment"* in the FMLA. 29 USC § 2611(11)(B). The District asserts that that definition is inapposite and, indeed, erroneous because "continuing treatment" is not the same as "constant care."[3] The District reasons that, under the correct "constant care" standard, complainant's condition does not constitute a "serious health condition" under the OFLA.

BOLI responds that the Commissioner's reference to the policy statement, and particularly its incorporation of the federal definitional standard, was appropriate under ORS 659.494(2). That statute provides:

"ORS 659.470 to 659.494 shall be construed to the extent possible in a manner that is consistent with any similar provisions of the [FMLA]. Family leave taken under

---

[3] The District further, and alternatively, contends in its second assignment of error that the Commissioner's reference to, and reliance on, the "policy statement" was error because that "statement is in fact, a rule that has been promulgated in noncompliance with the Administrative Procedures Act." *See* discussion below, 169 Or App at 507.

[the OFLA] must be taken concurrently with any leave taken under the [FMLA]."

BOLI asserts that "constant care" and "continuing treatment," as components of the state and federal statutory definitions of "serious health condition" are "similar provisions" and thus, as required by ORS 659.494(2), the Commissioner's construction of the OFLA in a "manner that is consistent with" the parallel provisions in the FMLA was proper.

The initial—and ultimately dispositive—issue is whether the state and federal formulations of "serious health condition" are sufficiently "similar" as to trigger the "consistent" construction mandate of ORS 659.494(2). We note, at the outset, that both the OFLA and the FMLA use the term "serious health condition" and that in both schemes entitlement to leave is conditioned upon the existence of a "serious health condition." *See* ORS 659.476(1)(c); 29 USC § 2612(a)(1).[4] Nevertheless, the two statutory schemes use different words to define "serious health condition."

The FMLA defines "serious health condition" as:

"[A]n illness, injury, impairment, or physical or mental condition that involves—

"(A) inpatient care in a hospital, hospice, or residential medical care facility; or

"(B) *continuing treatment by a health care provider.*" 29 USC § 2611(11) (emphasis added).

The OFLA defines "serious health condition" as:

"(a) An illness, injury, impairment or physical or mental condition that requires inpatient care in a hospital, hospice or residential medical care facility;

"(b) An illness, disease or condition that *in the medical judgment of the treating health care provider* poses an imminent danger of death, is terminal in prognosis with a

---

[1] 29 USC § 2612(a)(1) provides:

"[A]n eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period for one or more of the following:

"* * * * *

"(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

reasonable possibility of death in the near future, or *requires constant care;* or

"(c) Any period of disability due to pregnancy, or period of absence for prenatal care." ORS 659.470(6) (emphasis added).

The inquiry thus reduces to whether "continuing treatment" and "constant care" are "similar" for purposes of ORS 659.494(2). The test is *similarity,* not identity. In resolving that question, we employ the "text-in-context" methodology of *PGE v. Bureau of Labor and Industries,* 317 Or 606, 610-11, 859 P2d 1143 (1993).

"Constant" is commonly defined as: "marked by continual recurring or by regular occurrence, operation or manifestation." *Webster's Third New Int'l Dictionary,* 485 (unabridged ed 1993). "Care" means "responsibility for or attention to safety and well-being." *Id.* at 338. Thus, a serious health condition that requires "constant care," as used in ORS 659.470(6), is a condition that requires continual attention for the patient's well being. Nothing in the OFLA's statutory context contradicts that plain meaning.

"Continuing" commonly means "continuous, constant * * * needing no renewal: lasting, enduring." *Webster's* at 493. "Treatment" means "the action or manner of treating a patient medically or surgically; * * * the action or manner of dealing with something often in a specified way." *Id.* at 2435. The term continuing is, by definition, analogous to "constant." "Treatment," though arguably more specific than the term "care," refers to the prescribed action for the care of a patient—*i.e.,* the specific course of conduct prescribed to medically or surgically treat a patient. Again, nothing in the FMLA's context contradicts that understanding.

■ We thus conclude that the definition of "serious health condition" as one requiring "constant care" is similar to the FMLA's definition of "serious health condition" as one involving "continuing treatment." Consequently, in construing the OFLA, the Commissioner did not err in referring to, and relying on, federal regulations defining "continuing treatment" as instructive in determining the content of "constant care" for purposes of ORS 659.470(6) and ORS 659.476.

■ The District next contends that the Commissioner erred in concluding that complainant was unable to perform an "essential function" of his position as custodian for the District. In particular, the Commissioner concluded that the job location was an essential function of complainant's job:

"The position Complainant held with [the District] existed to provide the Lynch Meadows School with custodial services. If that were not the case, [the District] would not have terminated Complainant from that position when he became unable to provide services at Lynch Meadows— instead it would have transferred him to another facility. * * * The essential nature of the requirement that Complainant work at Lynch Meadows was proved when [the District] terminated Complainant's job when he became unable to work at that single school."

In so concluding, the Commissioner relied, in part, on a BOLI policy statement that defines "essential function" as:

"1.   The function or functions for which the position exists; or

"2.   a function or function which only a few people are routinely able to perform; or

"3.   a highly specialized function for which the employee has specialized knowledge." *Family Leave Laws in Oregon,* 94-96 (1996).[5] (Emphasis in original.)

The District does not challenge BOLI's policy statement. Instead, the District asserts generally that the Commissioner erred in concluding that the location of the job— *i.e.,* the specific school where the custodial work was to be performed—was an "essential function" of complainant's job:

"In essence, what the Commissioner has held is that simply being at one worksite among many in the District, and working with one particular set of co-workers is an essential function of the position of custodian. Furthermore, even though [complainant] could sweep, clean, repair, lift, move and any other conceivable duty that could be assigned to a custodian, he was still unable to perform the essential functions of the position. Most importantly, the Commissioner would have the court believe that even

---

[5] The OFLA does not define "essential function."

though he could do all of those tasks at a different location during the same time period he was allegedly disabled, he was unable to perform the identical tasks at a different location. Such a result was not intended by the statute."

In support of its position, the District relies on cases involving claims under the Americans with Disabilities Act of 1990 (ADA), 42 USC § 12101 *et seq.* Specifically, the District asserts that *Wieler v. Household Finance Corp.*, 101 F3d 519, 524 (7th Cir 1996); *Dewitt v. Carsten,* 941 F Supp 1232 (ND Ga 1996); and *Palmer v. Circuit Court of Cook County, Social Service Dept.,* 905 F Supp 499, 507-08 (ND Ill 1995), "demonstrat[e] that it is not enough for an employee to simply not like his work environment."[6]

BOLI agrees that the FMLA, and by extension, the ADA, interpretations *may* assist us in our construction of the OFLA. BOLI argues, however—and we agree—that, in this case, the ADA authority that the District invokes is inapposite.

The ADA prohibits discrimination against a "qualified individual with a disability." 42 USC § 12112(a). To prevail on a claim for disability discrimination under the ADA a plaintiff must show that he or she is (1) a disabled person within the meaning of the ADA; and (2) qualified, that is, with or without reasonable accommodation, able to perform the essential functions of the job. In addition, the plaintiff must show that he or she suffered an adverse employment action because of the disability. *Wieler,* 101 F3d at 523-24. None of the cases that the District relies upon address the issue whether, as here, the complainant was able to perform the "essential functions" of the job. Rather, each of those cases address whether the plaintiff was "disabled" within the meaning of the ADA. That inquiry—*i.e.,* whether the plaintiff is disabled for purposes of the ADA—is not relevant to a

---

[6] The District's reliance on cases under the ADA stems from ORS 659.494, which provides that the OFLA is to be construed "to the extent possible in a manner that is consistent with any similar provisions of the [FMLA]." The FMLA regulations, in turn, direct that a determination of the ability to perform the essential functions of the position shall be defined "within the meaning of the Americans with Disabilities Act (ADA), 42 USC § 12101 *et seq.,* and the regulations at 29 CFR § 1630.2(n)." 29 CFR § 825.115.

determination of whether the plaintiff is able to perform the essential functions of a job.

Under the ADA, a "disability" is a "physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." The plaintiff in *Wieler* alleged that her disability—*viz.*, TMJ disorder, anxiety and depression—substantially limited her ability to work (a major life activity), and attributed her disability to her employer. Specifically, she alleged that a mental condition caused by an employer's workplace can qualify as a disability under the ADA. The court rejected that contention, stating:

> "The major life activity of working is not 'substantially limited' if a plaintiff merely cannot work under a certain supervisor because of anxiety and stress related to his review of her job performance. Moreover, 'exclusion from one position of employment does not constitute a substantial limitation of a "major life activity." ' Rather, with respect to the major life activity of working, 'substantially limits' must mean significantly restricts the ability to perform a class of jobs or a broad range of jobs in various classes. Wieler claims that she can do her job, but not while being supervised by [her supervisor]. If Wieler can do the same job for another supervisor, she can do the job, and does not qualify under the ADA. We conclude that Wieler is not 'disabled' as that term is used in the ADA." 101 F3d at 524-25 (citations omitted).

That analysis pertained strictly to whether the plaintiff was 'disabled,' not whether she was able to perform the essential functions of the job. Both *Dewitt* and *Palmer* addressed that same question under facts similar to *Wieler*. None of those cases, however, considered the ability to work at a specific job site as an *essential function* of the job.

Contrary to the District's contention that job location cannot be an essential function of a job—and particularly this complainant's job—those courts that have considered the issue under the ADA have held that, except in the unusual situation where an employee can perform all the job functions at home, the ability to work at the specific job site is an essential job function. *Waggoner v. Olin Corp.*, 169 F3d 481, 484-85 (7th Cir 1999) (citing *Nowak v. St. Rita High Sch.*, 142 F3d 999, 1003 (7th Cir 1998) ("[An] employee who

does not come to work cannot perform the essential functions of his job.'")); *Tyndall v. National Educ. Ctrs.,* 31 F3d 209, 213 (4th Cir 1994) (a middle school teacher who cannot come to school is unable to perform any of the essential functions of the job: "Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee 'who does not come to work cannot perform any of his job functions, essential or otherwise.' ").

In sum, nothing in the ADA decisional law compels the conclusion that, in the circumstances presented here, working *at Lynch Meadows* was not an "essential function" of complainant's employment. Rather, we agree with BOLI's observation in its brief that:

> "The difficulty with the District's argument is that the District made work at a particular school an essential function of [complainant's] job. It is certainly true that the term generally has reference to specific job duties or tasks and not to the place where the work is done; however, in this case, the employer insisted that the job *was* working at Lynch Meadows.
>
> "* * * * *
>
> "The District structured [complainant's] proposed return to work so as to transform his job into working at Lynch Meadows * * * [T]he District presented [complainant] with two options, both of which required that he work at least four hours per day at Lynch Meadows: he could either return to work full-time, working at least four hours at Lynch Meadows, or he could work half-time, with all of that time spent at Lynch Meadows. * * *
>
> "By the time of [complainant's] discharge, his job, as defined by the District, was not working as a school custodian; his job was working as a school custodian *at Lynch Meadows.*" (Emphasis in original.)

The Commissioner correctly concluded that performance at Lynch Meadows was an essential function of complainant's job.

■     Finally, the District argues that the Commissioner erred in concluding that complainant's inability to perform the essential functions of his job was "as a result of" his serious health condition. Essentially, the District contends that

the evidence did not establish the requisite causal "nexus" between claimant's depression and his inability to work at Lynch Meadows.

Substantial evidence supports the Commissioner's contrary conclusion. For example, complainant's psychologist stated:

> "Location not number of hours of work, have resulted in job stress for [complainant]. The work environment at Lynch Meadows created the stress that led to the depression. Given that there has not been a successful resolution of the situation there it is my opinion that [complainant] would not be able to continue to recover if he was forced to return to work there full time."

Complainant also testified that his symptoms worsened when he went to Lynch Meadows and that he experienced suicidal thoughts as he was driving to the Lynch Meadows site. That evidence amply established the necessary "nexus."

The District's second assignment of error asserts that the Commissioner's reliance on the BOLI policy statement defining "constant care" was erroneous because that "statement" was, in fact, a rule—and that putative "rule" had not been promulgated in accordance with the notice and comment requirement of the Oregon Administrative Procedures Act. ORS 183.310 to ORS 183.550. As noted, the Commissioner's reliance on that "policy statement" was also the subject of the first of the District's three alternative arguments in support of its first assignment of error. Our disposition of that argument, 169 Or App at 499-503, obviates the second assignment of error.

Because "constant care" under the OFLA and "continuing treatment" under the FMLA are "similar" terms, the Commissioner, in construing and applying the former, was entitled, under ORS 659.494(2), to refer to federal authority interpreting the latter. *Id.* Starkly: If there were no BOLI policy statement, the Commissioner could properly have referred directly to 29 CFR section 825.114 in construing "constant care"; the fact that there is a BOLI policy statement that arguably could, or should, have been promulgated as a rule does not alter the substantive correctness of the underlying statutory construction.

■ In all events, we agree with BOLI that the applicable statute does not require it to adopt a rule interpreting or defining the statutory term "constant care" and that it therefore was within BOLI's authority to announce its interpretation of that term in the course of this proceeding. *See Trebesch v. Employment Division*, 300 Or 264, 710 P2d 136 (1985) (agencies may express their interpretation of the laws they are charged with administering either by adjudication or by rulemaking or both); *Coast Security Management Corp. v. Real Estate Agency*, 155 Or App 579, 964 P2d 306 (1998) (agency may give content to a disputed statutory term through a contested case decision).

■ Finally, the District assigns error to the award of damages, contending that the Commissioner's award of $25,000 for mental suffering was not supported by substantial evidence in the record. The Commissioner found:

> "After [the District] terminated Complainant's employment, he sank further into his depression. At one point, he went into his room and did not emerge for about a week. Prior to his termination, Complainant's wages had been his family's major source of income, and the loss of income was devastating, particularly because Complainant did not start receiving unemployment benefits for several months. The family's home went into foreclosure, their credit ratings were ruined, and they had to rely on food stamps. Complainant's ability to communicate effectively deteriorated and his personality changed. He has become gun-shy, tentative, and irritable around people and avoids dealing with them. Complainant's three school-age children recognize that he has changed and his relationship with them has weakened as a result. Complainant no longer participates in many activities with his wife and children; he sometimes 'goes away' by himself, which he had not done before."

The District argues that complainant's mental distress antedated the denial of OFLA leave, and there is no evidence that the wrongful denial of leave and discharge exacerbated complainant's depression. Alternatively, the District asserts that, in all events, the award of damages was excessive.

Based on our review of the record as a whole, ORS 183.482(8)(b)(C), we reject those arguments without further discussion.

Affirmed.