Argued and submitted July 24, affirmed December 17, 2003, petition for review
denied April 20, 2004 (336 Or 615)

Kent GAMBEE,
*Petitioner,*

*v.*

DEPARTMENT OF FORESTRY,
*Respondent.*

98-KL018A-O, 98-KL019, 98-KL020; A112287

81 P3d 734

Gary L. Simms argued the cause and filed the briefs for petitioner.

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

LANDAU, P. J.

**LANDAU, P. J.**

Petitioner Kent Gambee seeks judicial review of a final order on reconsideration of the Board of Forestry (board). In that order, the board determined that Gambee, who is a landowner and lumber broker, had conducted a timber harvest operation within the meaning of the Oregon Forest Practices Act, ORS 527.610 to 527.770, ORS 527.990(1), and ORS 527.992, and that he was liable for violations of administrative rules pertaining to the retention and protection, during timber harvest operations, of bald eagle nesting sites. The board imposed civil penalties totaling $40,737.50. On review, Gambee argues that he was not an operator of a timber harvest operation within the meaning of the applicable statutes and rules and that, even assuming that he was subject to a penalty for the violations, the board erred in imposing a separate penalty for each of 15 trees cut. Reviewing for substantial evidence and errors of law, ORS 183.482(8), we affirm.

## I.   FACTUAL BACKGROUND

The relevant facts are not in dispute. Gambee is a lumber broker. He buys and manages timberland, finds operators to cut timber, and then sells the land. Gambee was the principal of Alpine Logging, Inc., Alpine Management, Inc., and Alpine Investors, Inc. (collectively Alpine). In 1995, Alpine purchased property in Klamath County known as the Algoma property. In early 1996, Alpine notified the State Forester[1] of its plan to harvest timber on the Algoma property. ORS 527.670(6). [2] The notification was signed by Dan Phillips, who worked for Alpine.

---

[1] The State Forester is appointed by the Board of Forestry and acts as the chief executive officer of the State Forestry Department. ORS 526.031.

[2] ORS 527.670(6) provides, in part:

"An operator, timber owner or landowner, before commencing an operation, shall notify the State Forester. The notification shall be on forms provided by the State Forester and shall include the name and address of the operator, timber owner and landowner, the legal description of the operating area, and any other information considered by the State Forester to be necessary for the administration of the rules promulgated by the board * * *. Promptly upon receipt of such notice, the State Forester shall send a copy of the notice to whichever of the operator, timber owner or landowner did not submit the notification."

In response to the notification, the Department of Forestry (department) informed Alpine in writing that there were bald eagle nest sites within or adjacent to the area of the proposed operation, including nest trees identified as tree number 670, which was within the western boundary of the property, and tree number 431, which was just outside the southern boundary of the property. The department informed Alpine of requirements applicable to an operation involving bald eagle nest sites, including submission of a written plan. *See* ORS 527.670(3)(a); ORS 527.710(3)(a).[3] The department listed Gambee as the emergency contact person for the property.

Meanwhile, Gambee hired a wildlife ecologist, Opps, to assess the property. Following each of three visits to the property, Opps submitted written reports to Gambee, in which Opps made observations and recommendations pertaining to nest trees number 670 and 431 and other "key components" of the nest sites.[4]

In early August 1996, Phillips submitted a written plan on behalf of Alpine. On August 20, the department rejected Alpine's plan on the ground that it did not adequately address the protection of the nest trees and other components of the nest site. At Phillips's request, the department sent him an explanation of the requirements for written plans for operations conducted within 300 feet of bald eagle nest sites, including a copy of the applicable rules. Phillips did not resubmit a written plan for the property.

---

*See also* OAR 629-605-0140(1)(a); OAR 629-605-0150. Unless otherwise noted, references to rules are to the versions that went into effect on January 1, 1997.

[3] ORS 527.670(3)(a)(B) requires approval of a written plan for operations occurring within 300 feet of a resource site "inventoried" as provided in ORS 527.710(3)(a). ORS 527.710(3)(a) pertains to inventories of "resource sites needing protection" that are to be maintained by the Board of Forestry, including sites relating to threatened and endangered species. The bald eagle is a threatened species.

[4] For the purposes of bald eagle nest trees, "key components" include perching trees, fledging trees, replacement nest trees, and buffer trees. OAR 629-665-0220(1)(c). A perching tree is a tree used by a bird for resting, marking its territory, or as an approach to its nest. OAR 629-600-0100(44). A fledging tree is a tree close to a nest that is regularly used by young birds to develop flying skills. OAR 629-600-0100(21).

The following year, in August 1997, Gambee met with a logger, Paul Kanna, in Ashland. After discussing the Algoma property with Kanna—including the fact that there were bald eagle nest sites on the property—Gambee hired Kanna's company, Kanna Logging, to log the property. That same month, Kanna filed a notification of operation, listing Kanna Logging as the operator and Alpine as the landowner and timber owner.

Also in August 1997, Gambee asked Opps to update the status of the nest sites. In a written report dated August 19, 1997, Opps informed Gambee that one of the nest trees, tree number 431, had been active that year, resulting in one fledgling eagle, but that nesting season had concluded and that "it should be safe for logging activity in the area as per the Oregon Forest Practice Rules." Opps noted that his earlier observations and recommendations regarding the site remained in force, including his recommendations for retaining various trees associated with the nest trees.[5]

On September 4, the department informed Kanna and Gambee in writing of the existence of the bald eagle nest sites. The department also informed them of the requirement of a written plan for operations during nesting season, January 1 through August 31, and for operations at any time of year that are conducted within 300 feet of such sites. The department requested a meeting to discuss the required preoperation inspection and evaluation of the property.

No written plan was submitted in regard to the Algoma property. In early December 1997, a local resident reported to the department that a logging operation was occurring on the property. A forest practices forester, Townsend, went to the property and discovered that Kanna had begun cutting on the southern boundary near nest tree number 431. Townsend attempted to locate tree number 431 but was unable to do so. Several days later, Townsend returned to the site with Opps and discovered that tree number 431 had been cut down. A week later, Townsend returned

---

[5] Gambee testified at the hearing that he did not receive Opps's August 1997 report until mid-December 1997, after the occurrence of the violations at issue here; at that time, the ecologist also provided a copy of his report to the department.

to the site with Opps and a United States Fish and Wildlife Service officer, Harrington. At that time, they discovered that all merchantable trees around nest tree number 670 had been cut. In addition, a skid road was present within 155 feet of tree number 670, and skidder tracks were visible within 32 feet of the tree.

As pertinent here, the department issued to Gambee three "Notices of Violation/Citation" and "Orders to Cease Further Violation."[6] The first citation alleged that Gambee had failed to protect a bald eagle nest resource site from damage during a forest operation, resulting in the destruction of 15 trees that were key components of nest tree number 670, in violation of OAR 629-665-0220(2)(a).[7] The second citation alleged that Gambee had failed to obtain approval of a written plan before conducting operations within 300 feet of a bald eagle nest site, in violation of OAR 629-605-0170(1)(c).[8]

---

[6] The department also issued citations to Kanna; those citations are not at issue on review.

[7] OAR 629-665-0220 provides, in part:

"(1) For bald eagle nesting sites, the resource site is the active nest tree and all identified key components:

"(a) An active nest tree is one in which a bald eagle has nested in the past, and that the State Forester determines to be structurally capable of successful future use, whether or not the tree still contains a nest.

"* * * * *

"(c) The key components associated with a bald eagle nesting site are perching and fledging trees, replacement nest trees, and a forested buffer around the nest tree.

"(2) The operator shall provide the following protection measures when operating within or near a bald eagle nesting site:

"(a) During and after forest operations, the resource site shall be retained and protected from damage. The operation shall be designed to protect the trees from windthrow;

"(b) During the critical period of use, operations shall be designed and conducted to not disturb bald eagles using the resource site;

"(A) Except as provided in paragraph (B) of this subsection, during the critical period of use, operations shall not be permitted within one-quarter (1/4) mile of the active nest tree or perch trees. * * *

"* * * * *

"(C) The critical period of use is January 1 through August 31. The specific critical period of use for individual nesting resource sites may be modified in writing by the State Forester depending upon the actual dates that bald eagles are present at the resource site and are susceptible to disturbance."

[8] OAR 629-605-0170 provides, in part:

The third citation alleged that Gambee had failed to obtain approval of a written plan before starting operations when a conflict existed with a bald eagle nest site, in violation of OAR 629-665-0020(2).[9]

After further reviewing the matter, the State Forester issued notices of civil penalty and proposed orders relating to the alleged violations. Pursuant to OAR 629-670-0220(2) (July 1, 1995), the State Forester issued separate notices of civil penalty and proposed orders for each of 15 trees cut in violation of OAR 629-665-0220(2), in the amount of $2,412.50 per tree, and notices of civil penalty and proposed orders in the amount of $400 each for the violations of OAR 629-605-0170(1)(c) and OAR 629-665-0020(2).

Gambee requested a hearing, which was held on February 16, 2000, before a hearing officer assigned from the Hearing Officer Panel. *See* Or Laws 1999, ch 849. The hearing officer issued a proposed order, which concluded that Gambee was an "operator" who had violated pertinent statutes and rules but which rejected the department's proposed

---

"(1) Operators shall obtain written approval from the State Forester of written plans before conducting any operations requiring notification under OAR 629-605-0140, which are within:

"* * * * *

"(b) 300 feet of a specific site involving threatened or endangered wildlife species * * *.

"(c) 300 feet of any resource site identified in * * * OAR 629-665-0200 (Threatened and Endangered Species that use Resource Sites on Forestlands) * * *.

"* * * * *

"(2) The State Forester shall notify the operator of the presence of one of the sites listed in section (1) of this rule and the requirement of the written plan at any time the State Forester determines the presence of the above sites.

"* * * * *

"(6) A written plan shall contain specific information applicable to the operation regarding but not limited to the location of roads and landings, road and landing design, construction techniques, drainage systems, disposal of waste materials, felling and bucking, buffer strips, yarding systems and layout, riparian management area protection measures, resource site protection measures and post-operation stabilization measures."

[9] OAR 629-665-0020(2) provides:

"If the proposed operation conflicts with the resource site, the operator shall obtain approval of a written plan from the State Forester before starting operations. * * *"

per-tree penalty on the ground that the department had insufficient guidelines or procedures for determining when it is appropriate to impose such penalties.

The department filed exceptions, and Gambee filed a response. On September 6, 2000, after hearing argument on the exceptions, the board adopted a final order. In that order, the board first concluded that Gambee was subject to liability for the alleged rule violations because he was an "operator" as defined in ORS 527.620(13) and OAR 629-670-0010(5). The board explained:

> "This is not a case where an absentee landowner, on the east coast, for example, who has no knowledge about his land or resource sites on it, telephones and hires a logging contractor in Oregon to harvest the landowner's land, and has no further involvement with the project. Here, [Gambee] was intimately involved with the property and the operation. [Gambee's] firm was listed as the operator in the notification filed on the same land in 1996. [Gambee] knew eagle nest sites existed on his property at least up through August 1997, shortly before the harvest commenced. [Gambee] knew those sites posed problems and challenges to any harvest. [Gambee] hired a biologist to assist in planning the harvest * * * an act in and of itself that demonstrated commercial activity relating to the harvest of trees on his land.

> "[Gambee] cannot shield himself from application of the statutes and administrative rules by hiring someone, who either implicitly or directly placed himself in the line of fire to take the fall for violating the administrative rules."

The board then determined that Gambee had violated OAR 629-665-0220(2)(a) and assessed civil penalties of $2,662.50 for each of the 15 trees removed from the 300-foot boundary around tree number 670, or $39,937.50. The board also determined that Gambee had violated OAR 629-605-0170(1)(c) and OAR 629-665-0020(2) and assessed civil penalties of $400 for each of those violations. As previously stated, Gambee's total civil penalty for all violations was $40,737.50. In assessing penalties on a per-tree basis, the board noted OAR 629-670-0220(2) (July 1, 1995), which provides for such enhanced penalties "when it is appropriate in the judgment

of the State Forester, considering the real or potential economic gain of operators involved." The board concluded that, in light of the real or potential gain involved in this case, the enhanced penalty was appropriate:

> "The facts establish that there was a potential for economic gain from the harvest of the trees on the tract as a whole and from the area around the eagle nest tree; that there was a real (though modest) economic gain from the harvest; and that there is further potential economic gain to be made from the subdivision and sale of the cleared land, which was the reason for the harvest. Under these facts, the Department's use of the penalty enhancement rule was permissible and justified."

The board later withdrew its final order for the purpose of addressing Gambee's argument, made for the first time in the September 6, 2000, board meeting, that the board lacked authority to impose per-tree penalties because the rules providing for such penalties were not in effect at the time of his violations. On July 26, 2002, the board issued a final order on reconsideration, in which it concluded that Gambee had failed to advance that argument at any time before the September 6, 2000, board meeting and that he therefore had waived the argument. "[I]n an abundance of caution," the board also addressed the merits of Gambee's argument and rejected it. In all other pertinent respects, the board adhered to its September 6, 2000, order.

## II. DISPOSITION OF THE MERITS

On review, Gambee advances six assignments of error. In the first assignment, he argues that the board erred in imposing any penalties against him because he is not an "operator" of a harvest operation within the meaning of the relevant statute and rules. In the second through the sixth assignments, he contends that the board erred in various respects in imposing separate penalties against him for each of the 15 trees that had been cut unlawfully.

### A. *First Assignment: Whether Gambee was an "operator"*

Gambee argues that the board erred in concluding that he was an "operator" of a timber harvest operation.

According to Gambee, he was at most an "absentee land-owner" and cannot be regarded as an "operator" because he did not "conduct" the "operation" on the Algoma property, as provided in the definition of "operator" in ORS 527.620(13). Gambee argues that Kanna conducted the logging operation and that he—Gambee—neither exercised nor had the right to exercise control over Kanna's operation.

The department responds that the relevant statutes do not define the terms "operator" and "operation" so narrowly. The department argues that an operator is a person, including a landowner or timber owner, who conducts any commercial activity relating to the growing or harvesting of forest tree species. Given the board's undisputed findings that Gambee conducted such activities, the department argues, he was, therefore, an operator who was subject to civil penalties for violation of the relevant rules.

■■ Gambee's assignment presents an issue of statutory construction. When the issue involves an administrative agency's construction of the relevant statute, the weight that we give to the agency's construction depends on the nature of the statutory terms. If the terms are "delegative" in nature, then judicial review of the agency's construction is highly deferential. *Meltebeke v. Bureau of Labor and Industries*, 322 Or 132, 142 n 12, 903 P2d 351 (1995). When the terms are "inexact," judicial review is governed by the interpretive analysis described in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), that is, we attempt to determine the intended meaning of the statute by reference to its text in context and, if necessary, its legislative history and other aids to construction. *Coast Security Mortgage Corp. v. Real Estate Agency*, 331 Or 348, 353-54, 15 P3d 29 (2000). In this case, the terms involved are inexact in nature. We therefore interpret the statute in accordance with the usual rules of statutory construction.

ORS 527.680(1) provides, in part, that the State Forester may cite an "operator" for violating various provisions of the Oregon Forest Practices Act. An "operator" is defined as "any person, including a landowner or timber owner, who conducts an operation." ORS 527.620(13). An "operation," in turn, is defined—subject to exceptions not

applicable to this case—as "any commercial activity relating to the establishment, management or harvest of forest tree species." ORS 527.620(12).

Thus, an "operation" includes not just the activity of harvesting forest tree species but also *"any* commercial activity *relating to"* such activity. ORS 527.620(12) (emphasis added). The term "relating to" ordinarily refers broadly to activities that are logically or causally connected. *See Webster's Third New Int'l Dictionary* 1916 (unabridged ed 1993) (defining the transitive verb "relate" in part as "to show or establish a logical *or* causal connection between") (emphasis added). Thus, an "operator" is one who conducts any commercial activity that is logically or causally connected to the establishment, management, or harvest of forest tree species.

Moreover, in ordinary parlance, one "conducts" something when he or she leads, directs, runs, or manages it. *See Webster's* at 474 (defining the transitive verb "conduct" as, among other things, "to bring by or as if by leading : LEAD, GUIDE, ESCORT * * * to lead as a commander * * * to have the direction of : RUN, MANAGE, DIRECT"). Nothing in the phrasing of the statute or anything in its context suggests that the legislature intended a meaning different from the ordinary meaning of the term. Thus, once again, it is clear from the wording of the statute that, to be considered an "operator," an individual need not personally harvest the trees.

In this case, the board found that, although Gambee did not personally log the property, nevertheless he was "intimately involved with the property and the operation." He knew that bald eagle nest sites existed on the property before the harvest began. Indeed, he hired a wildlife ecologist to assist in planning the harvest in light of the existence of those bald eagle nest sites. He then contracted with Kanna to log the property after meeting with Kanna to discuss the existence of the bald eagle nest sites. In other words, Gambee managed a number of commercial activities that related to the harvest of trees at the Algoma property. Accordingly, the board did not err in concluding that Gambee was an "operator" within the meaning of ORS 527.620(13).

B.  *Second Assignment: Authority for per-tree penalties*

In his second assignment of error, Gambee argues that the board lacked authority to impose civil penalties on a per-tree basis because the rule authorizing the imposition of such penalties was not in effect at the time of his violations. According to Gambee, the board imposed penalties pursuant to OAR 629-670-0220, which he contends applies only to violations that occurred after May 1, 1998. Gambee argues that, for violations that occurred before that date, civil penalties should be assessed in accordance with OAR 629-670-0200 and OAR 629-670-0210, which do not mention authority to impose penalties on a per-tree basis.[10] The department responds that Gambee did not preserve that issue and that, in any event, the per-tree civil penalty rule was in effect at the time of his violations and therefore properly was applied to him.

■     We begin with the department's contention that the assignment was not preserved, because it is dispositive. OAR 627-670-0310(2) provides that a person who is requesting a hearing on a violation is required to "affirmatively state, in writing, any and all claims or defenses the person may have and the reasoning in support of the claim or defense. *Otherwise, failure to raise a claim or defense shall be presumed to be a waiver of such claim.*" (Emphasis added.) The parties agree that Gambee did not raise, until after the February 16, 2000, hearing, the argument that the per-tree civil penalty

---

[10] Gambee's argument is based on OAR 629-670-0000 (May 1, 1998), which provides, in part:

"(1) Except as provided in sections (2) and (3) of this rule, the provisions of OAR 629-670-0000 to 629-670-0350, as amended March 4, 1998, shall become effective May 1, 1998.

"(2) For violations determined to exist after July 1, 1995, and before May 1, 1998, civil penalties shall be assessed according to OAR 629-670-0200 and 0210, as they were in effect immediately prior to March 4, 1998."

OAR 629-670-0200 sets out procedural requirements for the assessment and issuance of notice of civil penalties. OAR 629-670-0210 sets out a formula for the calculation of the "amount of civil penalty per violation," including multipliers for factors such as the operator's cooperation in ceasing and correcting the violation, the operator's prior knowledge of the Forest Practices Act, the amount of damage caused by the violation, and the reparability of the damage.

rule was inapplicable by reason of its effective date. Accordingly, the board did not err in concluding that Gambee had waived the argument.

■      Gambee insists that, even if he failed to preserve the argument, it involves a question of law that is apparent on the face of the record and therefore should be addressed anyway. Although Gambee is correct that the issue he raises is a legal one and is discernible on the face of the record, the board's asserted error is not "apparent." To constitute error apparent on the face of the record, the error must be obvious and "not reasonably in dispute." *State v. Rogers*, 185 Or App 141, 147, 59 P3d 524 (2002) (citing and quoting *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990)); *see also Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381, 823 P2d 956 (1991). In this case, whether the rules authorize the imposition of per-tree penalties is reasonably in dispute.[11] We therefore reject Gambee's second assignment without further discussion.

## C.   *Third Assignment: Validity of penalty enhancement rule*

In his third assignment of error, Gambee contends that the board erred in imposing per-tree civil penalties because, under OAR 629-670-0220(2) (July 1, 1995), the imposition of such penalties is solely within the "judgment" of the State Forester and the department lacks written rules or policies pertaining to the exercise of that judgment. Citing *Megdal v. Board of Dental Examiners*, 288 Or 293, 605 P2d 273 (1980), Gambee argues that the board unlawfully applied a standardless rule.

---

[11] It is arguable that OAR 629-670-0220 (July 1, 1997) is applicable to Gambee's 1997 violations. OAR 629-670-0000 (May 1, 1998) was filed on March 31, 1998, and, by its terms, went into effect on May 1, 1998. As noted above, subsection (1) of the rule provides that, "[e]xcept as provided in sections (2) and (3) of this rule, the provisions of OAR 629-670-0000 to 629-670-0350, *as amended March 4, 1998*, shall become effective May 1, 1998." (Emphasis added.) Subsection (2) provides that, for violations that existed after July 1, 1995, and before May 1, 1998, the board shall assess civil penalties as provided in the versions of OAR 629-670-0200 and 629-670-0210 that were in effect before May 1, 1998. Thus, the apparent purpose of OAR 629-670-0000 is to indicate the effective dates of the specified amendments, OAR 629-670-0220 (July 1, 1995) was not amended at that time.

The department argues that the rule itself provides sufficient guidance for the exercise of the State Forester's discretion, namely, its reference to consideration of the operator's "real or potential economic gain." The department also contends that, consistently with ORS 183.355(5), *Trebesch v. Employment Division*, 300 Or 264, 267-70, 710 P2d 136 (1985), and *Centennial School Dist. No. 28J v. BOLI*, 169 Or App 489, 508, 10 P3d 945 (2000), *rev den*, 332 Or 56 (2001), it properly interpreted and applied its per-tree penalties rule in the context of a contested case proceeding.

In *Megdal*, the Supreme Court held that the Board of Dental Examiners acted outside the scope of its delegated authority when it revoked a license for "unprofessional conduct" without first adopting a specific code of conduct. 288 Or at 320-21. It is well settled, however, that an agency need not adopt rules establishing the agency's policy in regard to every possible factual circumstance that may arise in the course of the agency's exercise of its enforcement functions. *See Larsen v. Adult & Family Services*, 34 Or App 615, 619-21, 579 P2d 866 (1978) (agencies are not subject to an "inflexible requirement that every refinement of an articulated policy be promulgated through" prior rulemaking); *see also Trebesch*, 300 Or at 270 (*Megdal* does not require that all policy-making functions be exercised only after rulemaking); *Megdal*, 288 Or at 314 (rules need not "catalogue all the types" of conduct that are subject to enforcement action in order to serve the purposes of "giving notice of censurable conduct" and confining the agency's discretion to the announced standards); *Marbet v. Portland Gen. Elect.*, 277 Or 447, 460-61, 561 P2d 164 (1977) (when exercising legislatively delegated decision-making authority, agency ordinarily does so according to standards adopted in prior rulemaking; however, agency may also develop its standards in context of particular case; standards that are stated in general terms can be made more concrete in the course of a particular proceeding).

■ In this case, OAR 627-670-0220(2) (July 1, 1995) does not give unbridled discretion to impose enhanced penalties. The rule provides that, "in order to deter future violations, each tree * * * harvested may be treated as a separate violation when it is appropriate in the judgment of the State Forester, considering the real or potential economic gain" of the

violator. Thus, it permits the imposition of an enhanced penalty only when there is sufficient real or potential gain derived from violating the Forest Practices Act and its implementing rules that the ordinary penalty would be insufficient to deter such conduct in the future. We agree with the department that the rule provides sufficient standards for the State Forester properly to exercise his or her discretion in determining whether to impose per-tree penalties.

D.   *Fourth and Fifth Assignments: Justification for penalties*

In his fourth and fifth assignments, Gambee challenges on the merits the decision to impose civil penalties on a per-tree basis. He argues that, even assuming that considerations of economic gain provide sufficient standards, in this case, the department failed to make the required showing to the board. Specifically, in the fourth assignment, Gambee challenges the board's failure to require the department to quantify the actual or potential economic gain derived from his violations. In the fifth assignment, he contends that the only evidence of actual economic gain was so minimal that the imposition of enhanced penalties amounts to an abuse of discretion.

In response, the department argues that, by its terms, OAR 629-670-0220(2) (July 1, 1995) does not limit the amount of actual economic gain to the value of the trees removed and does not require that any potential gain be quantified. It further argues that, under *Don't Waste Oregon v. Energy Facility Siting Council*, 320 Or 132, 881 P2d 119 (1994), we should defer to that interpretation of the rule. The board also contends that other factors, including Gambee's knowledge of the existence of the bald eagle nest site, supported the imposition of a per-tree penalty in this case.

We agree with the board that, by its terms, the rule reasonably may be read not to require the State Forester to establish any minimum amount of economic gain or otherwise to quantify an operator's gain. It also may reasonably be read not to limit the amount of the penalties to the amount of gain.[12]

---

[12] We also agree that, as discussed above, an operator's economic gain is not the only factor that the State Forester can consider in deciding whether to impose a

■     The question then becomes whether substantial evidence supports the board's finding that Gambee's failure to protect the Algoma resource site involved "real or potential economic gain" by Gambee. In the hearing, several witnesses testified that Gambee obtained at least some economic gain. Gambee himself testified that he grossed approximately $89,000 from the timber harvest of the property as a whole and netted approximately $500 from the 15 trees that were the subject of the penalties. In addition, a realtor, West, testified that Gambee had informed him that he was thinking of logging the property "[a]nd then reselling" and that he, West, had visited the property to help determine which trees should be saved "because the idea was that this is—it says zoning for 20-acre parcels, I believe. So it could be zoned into 20-acre parcels" to be used as home sites.

On the basis of that testimony, the board found that Gambee had netted approximately $500 for the 15 trees comprising the resource site and that he had hoped to sell some of the Algoma property for "acreage homesites" after completion of the logging operation. The board also noted the existence of Gambee's economic gains from the harvest of the property as a whole, as well as his potential gain from the subdivision and sale of the property. Based on the record as described above, substantial evidence supports the board's findings regarding Gambee's real and potential economic gains. Given those findings, the board did not abuse its discretion in imposing civil penalties against Gambee on a per-tree basis.

E.    *Sixth Assignment: Excessiveness of penalties*

In his final assignment, Gambee argues that the total penalty violated ORS 527.685(1), which limits penalties to a maximum of "$5,000 per violation." According to Gambee, the statute does not permit the board to regard the unlawful cutting of each tree as a separate violation. The department argues, once again, that Gambee failed to preserve the argument. In any event, it argues, each unlawfully

per-tree penalty under OAR 629-670-0220(2) (July 1, 1995); in particular, the State Forester also properly may consider the deterrence purpose of the rule. A logical consequence of that understanding of the rule is that, where some factors are present to a greater extent, other factors can be present to a relatively lesser extent.

cut tree amounted to a "violation" within the meaning of the statute. Gambee acknowledges that he failed to make the argument to the board. Nevertheless, he argues, we should address the matter as apparent error.

■     We conclude that the assignment was not preserved and that any error is not apparent. We note that ORS 527.685(1) does not define the term "violation." Gambee's argument about the meaning of the term is contextual. He reasons that, because one of the statutory factors that the State Forester is authorized to consider in imposing a civil penalty is "the gravity and magnitude of the violation," ORS 527.685(2)(c), it necessarily follows that a single violation must encompass the unlawful harvesting of multiple trees. In brief, Gambee's argument, while plausible, does not necessarily follow. As we have noted, to constitute error apparent on the face of the record, the error must be obvious and "not reasonably in dispute." *Rogers*, 185 Or App at 141. Gambee's argument does not satisfy that standard. We therefore decline to address it for the first time on review.

Affirmed.