Argued and submitted March 16, affirmed September 1, 2004

# J. R. SIMPLOT COMPANY,
*Petitioner,*

*v.*

# DEPARTMENT OF AGRICULTURE,
*Respondent.*

2000-1; A118024

96 P3d 1262

Christopher A. Rycewicz argued the cause for petitioner. With him on the briefs were Christopher W. Rich and Rycewicz & Chenoweth, LLP.

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Linder and Wollheim, Judges.

LINDER, J.

■■■■■■

## LINDER, J.

Petitioner processes potatoes. Because the resulting product—french fries—is sold in interstate commerce, the potatoes are subject to federally required inspection after they are delivered for processing. Petitioner and the potato growers have the option of having the inspection performed by state inspectors working for the Oregon Department of Agriculture (department). If they so opt, they pay a fee for the inspection, which under state law must be set at an amount "reasonably necessary to cover the cost of the inspection and administration" of the department's program. ORS 632.940(3). From 1993 to 1999, petitioner and its growers opted to have the department perform the inspections. Then, midway through 1999, they discontinued department inspections and instead began using private inspection services.

After severing its relationship with the department's inspection program, petitioner petitioned the department for a refund of a portion of the inspection fees paid from 1993 to 1999. Petitioner claimed that the department's fees during those years exceeded the amount authorized by law because they were set in an amount designed to create a "reserve fund" for the department's inspection program. Distinct from that requested relief, petitioner also challenged a 1999 department order denying petitioner a grant of capital improvement funds to be used to improve its inspection facilities. Following a contested case hearing, the department determined that petitioner was not entitled to a refund. The department also affirmed its denial of petitioner's application for capital improvement funds. Petitioner now seeks review, raising six assignments of error, five of which are directed to the department's denial of a refund and one of which is directed to the denial of the grant of capital improvement funds. As we explain below, we reject petitioner's various challenges to the department's refusal to grant petitioner a refund of fees because we conclude that the agency lacks authority to pay the requested refund. We affirm the denial of the grant of capital improvement funds.

■ In seeking a refund of inspection fees paid from 1993 to 1999, petitioner relied on ORS 293.445(2), which provides:

"When any agency determines that moneys have been received by it in excess of the amount legally due and payable to the agency or that it has received moneys to which it has no legal interest, the agency, *within three years from the date the money was paid to the agency*, shall refund the excess or erroneous payment to the person who made the payment or to the person's legal representative, and such moneys hereby are continuously appropriated for such purpose."

(Emphasis added.) At oral argument, we asked the parties to submit supplemental memoranda of authority addressing whether, given the emphasized language of the statute, petitioner's entitlement to a refund for fees paid from 1993 to 1999 is moot or otherwise defeated by the three-year limitation. We now conclude that the answer is yes.

ORS 293.445(2) achieves two ends. First, it gives a state agency the authority and the obligation to refund to the person who paid it any excess money that the agency receives. Second, it provides that excess money so received is continuously appropriated to the agency for payment of the refund. Significantly, in giving an agency authority to refund excess money, the statute simultaneously limits that authority by declaring that an agency shall make any such refund "within three years from the date the money was paid to the agency." The agency's appropriation authority is likewise limited. That is, the excess funds are continuously appropriated "for such purpose," which refers back to the agency's obligation and authority to refund excess money "within three years from the date the money was paid to the agency."

That limitation on an agency's refund authority is significant. State government agencies and entities have no authority to withdraw and pay public funds, whether in the form of refunds or otherwise, unless the legislature has expressly extended that authority to them by authorizing an expenditure and making an appropriation for it.[1] Necessarily, then, an agency may withdraw and pay public funds only

_____

[1] *See* Or Const, Art IX, § 4 ("No money shall be drawn from the treasury, but in pursuance of appropriations made by law."); ORS 293.295 ("A claim for payment from any moneys in the State Treasury may not be paid unless: * * * (2) [p]rovision for payment of the claim is made by law and appropriation[.]"); *see also Shattuck v. Kincaid*, 31 Or 379, 386-87, 49 P 758 (1897) (an appropriation is a legislative act earmarking funds for a specific purpose and authorizing expenditure for that purpose).

in accordance with any limitations that the legislature places on that authority. The refund statute on which petitioner relies does not grant agencies open-ended authority to refund money no matter how many years or budget cycles have gone by since its receipt. Rather, the statute unequivocally and expressly gives agencies authority to refund excess fees only within three years from the date the money was paid, and it likewise limits the appropriation accordingly. The department can make a refund only on those terms.[2] Because of the three-year limitation in the statute, the department no longer can give petitioner the relief it seeks.

In arguing to the contrary, petitioner relies primarily on the reference in the statute to a "continuous appropriation" for paying refunds. Petitioner urges that the plain meaning of "continuous" is ongoing or perpetual and, thus, refunds may be made at any time after an agency receives excess money. The first problem with that argument is that it would render the language "within three years from the date the money was paid to the agency" as surplusage. The legislature deliberately placed that limitation in the statute, and we must give it effect. See ORS 174.010 (statutes shall be interpreted to give effect to all text).

Second, and more fundamentally, petitioner's argument misunderstands the effect of a "continuous" appropriation. A continuous appropriation is one that, once made, need not be made again with each ensuing biennium. Instead, the funds so appropriated remain available to the agency from one biennium to the next. See generally State ex rel Kane v. Goldschmidt, 308 Or 573, 586 n 11, 783 P2d 988 (1989) (continuing appropriation statutes require no further action by the legislature to place the funds at an agency's disposal). The fact that the agency receives a continuous appropriation to make an authorized expenditure does not change the scope

---

[2] Petitioner cites no other statutory source of authority for agencies generally, or the department in particular, to refund excess money received by the agency. Nor have we identified one. Worth noting is that the department may make refunds, "[n]otwithstanding the provisions of ORS 293.445(2)," of excess monies that it receives "relating to the issuance or renewal of licenses, permits, registrations, or certificates under its jurisdiction[.]" ORS 561.303(1). The fees for the cooperative inspection program involved in this case do not fall within the enumerated categories.

of the agency's authorization to spend the money. Said another way, the purpose for which the funds are appropriated remains subject to whatever limitations the legislature imposed in authorizing the expenditure. Here, that express limitation is that the refund must be made within three years of the date that the excess money was paid to the agency.

Alternatively, petitioner asserts that, even if an agency's refund authority under ORS 293.445(2) is limited to three years from the date that excess moneys were paid to the agency, it "is entitled to refund for excess or erroneously paid fees from at least January of 1997 forward"—*i.e.*, three years before the date on which petitioner requested a refund. Petitioner does not develop its argument further or offer us any legal analysis to support it.

The text and context of the statute refute petitioner's position. ORS 293.445(2) expressly provides that an agency shall refund excess or erroneous payments made to it "within three years from the date the money *was paid* to the agency." (Emphasis added.) By the statute's plain terms, then, the limitation period runs from the date of *payment to* an agency, not from the date on which someone *requests* a refund. Context, in the form of the prior version of the statute, demonstrates that the legislature meant what it said. *See State v. Webb*, 324 Or 380, 390, 927 P2d 79 (1996) (prior enacted versions of a statute are part of its context). Before 1983, the statute provided:

> "When any agency determines that moneys have been received by it in excess of the amount legally due and payable to the agency or that it has received moneys to which it has no legal interest, *the agency, upon application made within the time provided by law, or within three years from the date the money was paid to the agency if no time is provided by law,* shall refund the excess or erroneous payment to the person who made the payment or to his legal representative, and such moneys hereby are continuously appropriated for such purpose."

ORS 293.445(2) (1981), *amended by* Or Laws 1983, ch 246, § 4. Thus, in its prior form, the statute required an application for a refund—*i.e.*, "upon application" the agency shall refund excess money paid to it. In 1983, the legislature

amended the statute by eliminating the requirement of an application for a refund. The legislature did so by striking the language referring to payment of a refund "upon application" and the references to the special time limits for making such applications:

> "When any agency determines that moneys have been received by it in excess of the amount legally due and payable to the agency or that it has received moneys to which it has no legal interest, the agency, ~~upon application made within the time provided by law, or~~ within three years from the date the money was paid to the agency ~~if no time is provided by law~~, shall refund the excess or erroneous payment to the person who made the payment or to ~~his~~ the person's legal representative, and such moneys hereby are continuously appropriated for such purpose."

Or Laws 1983, ch 246, § 4 (strike-out material repealed). Consequently, in its current form, an application plays no mandatory part in the refund process. An agency has the authority and the obligation to refund excess moneys that it receives regardless of whether it receives an application for a refund.[3] Necessarily, then, the legislature could not have intended for an agency's authority to pay the refund to run from the date of an application. Consistently with the prior version of the statute, the legislature also did not leave the agency's authority to refund excess moneys open ended, with the fiscal uncertainty that such authority would entail. It therefore provided for a maximum time period—three years—within which a refund could be paid. The time period runs expressly from the date on which the money *was paid* to the agency. More than three years have passed since petitioner paid any inspection fees to the department. Petitioner's assignments of error

---

[3] We see no ambiguity in the point of the 1983 amendment. To whatever extent it may be ambiguous as amended, however, the legislative history makes the purpose of the amendment clear. As the staff measure summary explained:

> "[U]nder current law when monies are received in excess of the amount legally due, an agency must wait for the payee to apply for a refund before the refund can be made. This measure would allow all agencies to automatically refund the monies paid in excess to the payee or the legal representative of the payee. The Executive Department has expressed their approval of this provision."

Staff Measure Summary, House Committee on State and Federal Affairs, HB 2312, Feb 1, 1983.

relating to its entitlement to a refund therefore fail, either because they are moot given the expiration of the agency's authority to pay any refund[4] or because that lack of authority defeats the merits of petitioner's claim.

The same is not true of petitioner's challenge to the department's denial of its 1999 application for a grant of capital improvement funds. No similar limitation exists on the department's authority to spend funds to improve inspection facilities for its program, and nothing in the record in this case suggests that the department has discontinued its program for doing so. Consequently, if we were to reverse the department's denial of petitioner's request, petitioner could receive relief in the form of a grant of the requested funds. We therefore turn to petitioner's challenge to that portion of the department's order.

To provide context for the issue, some additional factual detail is helpful.[5] As earlier described, the department assesses fees for its inspection services, which are deposited in a dedicated fund that is used to meet the costs of the inspections and administration of the inspection program. *See* ORS 632.940; ORS 632.945. For many years, the department has set the fees at an amount designed to create a reserve fund for contingencies. By the late 1990s, that fund had grown larger than necessary to meet program costs. The department therefore decided to reduce it through two means. First, the department reduced future inspection fees. Second, it established a program to invest in facilities where department employees performed inspections by funding safety and efficiency enhancements to those facilities. The department accomplished the latter objective by developing a program to grant capital improvement funds to the private facilities where it conducts its inspections. Although termed "grants," the department does not actually pay the funds to the owners of the facilities. Rather, the department further reduces its prospective inspection fees for those processors,

---

[4] *See Brumnett v. PSRB*, 315 Or 402, 406, 848 P2d 1194 (1993) (cases that are otherwise justiciable become moot if the court's decision no longer will have a practical effect on or concerning the rights of the parties).

[5] We draw from the pertinent facts that the department found in its order, none of which petitioner challenges.

and the processors, in turn, commit to use the savings from that reduction to improve their inspection facilities. As of 1999, when petitioner applied for a grant of capital improvement funds, only one such grant had been made; that grant had been made to another processor (Ore-Ida).

Before petitioner actually applied for a grant of capital improvement funds from the department, petitioner let department officials know that it intended to ask for an outright grant of funds rather than a special reduction in prospective inspection fees. Petitioner did not want a prospective fee reduction because by then it was encouraging its growers to opt for private inspections and it was hoping to discontinue the department's inspection services altogether. After petitioner submitted its application for a grant of capital improvement funds in late March 1999 and before the department had yet acted on that application, petitioner made clear to the department that it was committed to private inspections. Consistently with that representation, petitioner at about that same time was soliciting a vote of its growers to discontinue the department's inspection services. In July 1999, the growers voted in favor of discontinuing the department inspections and, shortly afterwards, did so.

■ In November 1999, the department completed its review of petitioner's application. It denied the application because, among other reasons, a grant of capital improvement funds to petitioner would inure only to petitioner's private benefit and would not provide a public benefit by enhancing the safety and efficiency of the department's inspection program. The department concluded that use of its fund for such a purpose would be beyond its statutory authority.

On appeal, petitioner abandons many of the arguments it advanced below in challenging the department's decision. It renews only its argument that, "[i]n a related Capital Improvement Grant given to Ore-Ida, * * * Ore-Ida's capital improvement agreement provide[d] that if the growers vote Ore-Ida out of the program, Ore-Ida would be able to keep the equipment without an amortization period." From that premise, petitioner urges that the department treated it in a "grossly differential" way in denying its application and

that the department's order "fail[ed] to adequately explain" the differential treatment.

Petitioner's argument overlooks the department's unchallenged factual findings regarding the differences between the grant to Ore-Ida and the grant that petitioner sought. As the department expressly described in its order, Ore-Ida agreed to allow the department to use the new equipment and facilities funded by the grant for a minimum of three years. That agreement ensured that the department would receive the benefit of the capital improvements. Petitioner did not propose a similar commitment. To the contrary, throughout the application process, petitioner made clear to the department that it intended to discontinue department inspection services in the immediate future. In fact, it did so. Under the circumstances, and in light of the department's unchallenged findings and explanation in its order, the "grossly differential" treatment that petitioner perceives did not occur.

Affirmed.