Argued and submitted September 7, 2005, decision of Court of Appeals and order of
Department of Agriculture affirmed March 9, 2006

# J. R. SIMPLOT COMPANY,
*Petitioner on Review,*

*v.*

# DEPARTMENT OF AGRICULTURE,
*Respondent on Review.*

## (ODA 2000-1; CA A118024; SC S52081)

131 P3d 162

──────────

Christopher A. Rycewicz, of Rycewicz and Chenoweth, LLP, Portland, argued the cause and filed the brief for petitioner on review. With him on the brief was Christopher W. Rich.

Denise J. Fjordbeck, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review Oregon Department of Agriculture. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

BALMER, J.

──────────

**BALMER, J.**

Petitioner J. R. Simplot Company (Simplot) seeks judicial review of an order of the Oregon Department of Agriculture (department), which denied a refund of inspection fees that Simplot had paid to the department. The Court of Appeals affirmed that order, holding that ORS 293.445(2) contains a three-year limitations period that had expired and thus barred the department from providing Simplot a refund. We affirm the Court of Appeals, but we do so on different grounds.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Simplot's primary complaint is that the department overcharged it for inspecting potatoes used to make french fries at Simplot's Hermiston plant. We briefly describe that inspection process before describing the particulars of this case. We take the facts from the department's final order, the Court of Appeals opinion, and from the record.

The quality and characteristics of agricultural products such as potatoes determine the product's grade, which, in turn, affects the product's price. ORS 632.940[1] authorizes the department to conduct inspections of agricultural products to determine their quality and characteristics. The department performs all inspections of agricultural products within Oregon unless the growers of those products vote to terminate the department's role, ORS 632.945 to 632.950, in which case licensed private inspectors perform that task. The department performs inspections through its Agricultural Shipping Point Inspection program (inspection program), using employees who are licensed through a cooperative agreement with a division of the United States Department of Agriculture (USDA).

---

[1] The department performed inspections for Simplot from 1993 through 1999. During that period, ORS 632.940 did not change in any way relevant to this opinion, and unless otherwise indicated we cite the 1999 version of the statute.

The department performs two primary types of inspections: fresh pack and processor. The department conducts fresh pack inspections on produce to be sold in unprocessed form. Those inspections are conducted at the time that the fresh produce is prepared for shipping from the grower. When conducting a fresh pack inspection of potatoes, a department inspector examines a sample of the potatoes for size, shape, skin condition, cleanliness, firmness, and other characteristics to grade them according to USDA standards. *See* 7 CFR §§ 51.1540 to 51.1587 (2005) (USDA standards for grading potatoes). The department conducts processor inspections on produce that will be processed into another form. Those inspections occur at the processing site. The type of services performed in a processor inspection varies depending on individual processors' needs. For potatoes that will be processed into french fries, the inspections generally include USDA grading as well as "french fry color" tests and tests of the potatoes' internal density. Some processors prefer to choose their own representative sample, while others request that the inspector choose the sample.

The department sets separate fees for fresh pack inspections and processor inspections. The fresh pack fees are set in cents per hundredweight, with minimum hourly fees to ensure that inspectors' costs are covered.[2] *See* OAR 603-053-0200 (establishing fresh pack fees). The processor fees are established on a regional basis in cents per hundredweight. Processors in the same area who request the same processor inspection services pay the same hundredweight rates.

ORS 632.940 provides that the costs of the inspection program and administration are to be covered by the fees that the department charges for inspections. In determining the fee levels, the department follows that statutory mandate

---

[2] The department's final order in this case states that fresh pack fees are set in cents per hundredweight; the order does not mention the minimum hourly fees. However, neither party contests that historical fact directly, and both parties' arguments in this court assume that the department assessed fresh pack fees on an hourly basis. The uncontradicted evidence in the record shows that the department set those fees both in cents per hundredweight and as hourly fees, as described in OAR 603-053-0200. Therefore, we conclude that the final order's statement to the contrary was not supported by substantial evidence in the record.

and attempts to ensure that the total amount of all fees is sufficient to cover the costs of the inspection program, including a reserve of approximately four months' operating costs. The purpose of that reserve is to ensure that the program can pay for itself despite fluctuating employee costs; varying crop quality, amount, and location; and unpredictable weather. The USDA also recommends, as part of the cooperative agreement, that the department maintain a four-month reserve to cover the costs associated with an unforeseen shutdown of the program. During the period at issue here, the department increased and decreased both fresh pack and processor fees from time to time in an attempt to match the fees with the cost of the inspection program, including the four-month reserve.

The department estimated that $1.25 million was sufficient to cover four months' operating costs. However, because of the very fluctuations that the reserve was meant to guard against, the amount of the reserve varied over time. In the early 1990s, the reserve was as little as $76,992. By fiscal year 1998, however, the reserve had risen to $2,330,733. When the fund balance rose, the department considered ways to manage it, including reducing future fees and making grants to fund capital improvements in processing facilities where the department's inspectors regularly worked. The purpose of those grants was to improve safety and working conditions for the inspectors, as well as to reduce the cost and increase the efficiency and accuracy of inspections.

During the time that the department performed processor inspections for Simplot, the total fresh pack inspection fees that the program collected were less than the total direct cost of providing fresh pack inspections, while the total processor inspection fees that the program collected were more than the total direct cost to the department of providing processor inspections.

We turn now to the circumstances and procedural history of this case. From at least 1993 to 1999, the department performed processor inspections of approximately 15 percent of the potatoes that Simplot processed in its Hermiston plant.[3] The department notified Simplot of fee

_____

[3] The remaining potatoes were grown in Washington and inspected by a private inspection service.

changes by letter whenever they occurred. After performing the inspections, the department issued invoices and monthly statements for inspection fees to Simplot, requiring payment within 30 days. Simplot paid the department for the inspections as invoiced.

In 1998, Simplot and some growers became dissatisfied with the department's inspection services. Under ORS 632.950, 20 percent of the growers that ship to a particular processor may request a vote on whether to terminate the department's inspections and instead have inspections conducted by a private inspector. The department conducted such a vote in the spring of 1998, but the growers voted to continue having the department perform the inspections. In July 1999, the growers again voted on whether to continue the department's inspection services, and that time the growers voted to discontinue those services. The department stopped inspections at Simplot's facility shortly thereafter.

In January 2000, Simplot filed a petition with the department alleging that the department had overcharged Simplot for processor inspections and requesting a refund. In March 2000, the department issued a notice proposing to deny the request for a refund. Simplot requested a contested case hearing, and the department referred the matter to a hearings officer who conducted a hearing and issued a proposed order denying Simplot's claim for a refund. Simplot filed exceptions to the proposed order, and the department issued a final order addressing those exceptions and denying Simplot's claim for a refund.

Simplot sought review in the Court of Appeals, which affirmed the department's final order. *J.R. Simplot Co. v. Dept. of Agriculture*, 195 Or App 98, 96 P3d 1262 (2004). Simplot petitioned for review of the Court of Appeals' decision. We allowed Simplot's petition for review.

## II. DISCUSSION

We begin with the Court of Appeals' ruling, which affirmed the final order on the basis of ORS 293.445(2). That statute provides:

> "*When any agency determines that moneys have been received by it in excess of the amount legally due* and payable

to the agency or that it has received moneys to which it has no legal interest, *the agency, within three years from the date the money was paid to the agency, shall refund the excess* or erroneous payment to the person who made the payment or to the person's legal representative, and such moneys hereby are continuously appropriated for such purpose."

(Emphasis added.) The Court of Appeals interpreted ORS 293.445(2) as a statute of limitations that deprived the department of authority to provide refunds after three years from the date that the person seeking a refund paid the money to the department. The court therefore affirmed the department's order denying a refund on the grounds that the agency's authority to comply with Simplot's refund request had expired. *Simplot,* 195 Or App at 101-03.

■ Neither the parties nor the Court of Appeals appear to have considered the meaning of the initial phrase of ORS 293.445(2): "When any agency determines that moneys have been received by it in excess of the amount legally due * * *." Nevertheless, when presented with a question of statutory interpretation, this court must identify the correct interpretation, whether or not the parties have suggested it. *Stull v. Hoke,* 326 Or 72, 77, 948 P2d 722 (1997) (stating principle). Because this case requires us to decide whether ORS 293.445(2) bars petitioners' claims, as the Court of Appeals held, we consider the statute to determine whether it applies.

For two reasons, we disagree with the Court of Appeals' conclusion that ORS 293.445(2) bars Simplot's claims in this instance. First, the plain text of ORS 293.445(2) shows that it applies only "when any agency determines that" a refund is due. In this case, no agency has made any determination that the department has received moneys "in excess of the amount legally due and payable" or "to which it has no legal interest." Therefore, ORS 293.445(2) does not apply.[4] Second, we do not think that ORS 293.445(2) constitutes a statute of limitation that prevents an agency

---

[4] ORS 293.445(2) does not require an agency to make that determination on its own initiative. A party might obtain a court order to the same effect, one by which the agency was bound. Alternatively, a party might ask the agency to make a declaratory ruling under ORS 183.410 that a refund was due.

from making refunds after the expiration of the three-year period. That statute states only that an agency "shall" make refunds within the three-year period, but that directive does not prohibit the agency from making refunds after the three-year period expires. Indeed, ORS 293.445(3) clarifies that an agency *may*, under certain conditions, make refunds after the three-year period:

> "Unless otherwise provided by law, any agency having in its possession any moneys held for refund or payment to claimants or distributees, or for determination or adjustment of license fees or of other amounts due the state, may, with the consent of the State Treasurer and in accordance with rules prescribed by the State Treasurer, deposit such funds in designated accounts with the State Treasurer and make lawful payments or adjustments therefrom to proper claimants or distributees, by checks or orders drawn on the State Treasurer signed by the officer or administrative head of the agency depositing such funds."

We agree with the Court of Appeals that an "agency may withdraw and pay public funds only in accordance with any limitations that the legislature places on [its] authority." *Simplot*, 195 Or App at 101-02. ORS 293.445, however, does not limit an agency's authority in that way. ORS 293.445(2) does not entirely cut off an agency's authority to make refunds at "three years from the date the money was paid to the agency," because ORS 293.445(3) clarifies that, more than three years after that payment, the agency *may* make refunds in the manner that that subsection prescribes.[5]

Having concluded that the Court of Appeals erred in disposing of Simplot's claim under ORS 293.445(2), we turn to the claim itself: that the department's method of determining fees for inspections of agricultural products was beyond the department's statutory authority, that the resulting fees were excessive, and that Simplot therefore is entitled to a refund.

ORS 632.940 grants the department the authority to perform fresh pack inspections. It further provides:

---

[5] We note that one or more other statutes of limitation may apply to a claim for a refund from a state agency. This opinion concerns only whether ORS 293.445 itself imposes a time limitation. As described above, we conclude that it does not.

"The department may fix, assess and collect, or cause to be collected, fees for such services when they are performed by employees or agents of the department. Such fees *shall be on a uniform basis in an amount reasonably necessary to cover the cost of such inspection and administration of this section.* The department shall so adjust the fees to be collected under this section as to meet the expenses necessary to carry out the provisions of this section, and may prescribe a different scale of fees for different localities. The department also may prescribe a reasonable charge for traveling expenses and services when such services involve unusual cost to the department in their performance."

(Emphasis added.) ORS 632.945, which governs processor inspections, requires the department to fix, assess, and collect fees for those inspections "in the manner and to the extent provided by ORS 632.940." ORS 632.945(3).

Simplot argues that the department overstepped its statutory authority in two respects when it set the fees for the department's processor inspections of Simplot's potatoes: (1) in charging more than was "reasonably necessary to cover the cost" of inspections and the administration of the inspection program, and (2) in assessing fees on other than a "uniform basis." We address each of those arguments in turn.

A. *"Reasonably Necessary" Fees*

■ Simplot first argues that the department erred by failing to set inspection fees in an amount that was "reasonably necessary to cover the cost of [the] inspection and administration" of the inspection program. In Simplot's view, maintaining reserve funds was not a proper part of what was "reasonably necessary." The department responds that the reserve was "reasonably necessary" as that phrase is used in ORS 632.940.

In *Springfield Education Assn. v. School Dist.*, 290 Or 217, 621 P2d 547 (1980), this court considered the interpretation of statutory terms that delegate authority to an administrative agency. *Springfield* delineated three categories of terms, each of which requires a different level of appellate court deference to an agency interpretation of a particular term. The first category includes "terms of precise meaning," the meaning of which are easily discernible on

their face and require only agency factfinding in their application. *Id.* at 223. This court reviews an administrative order applying a term of precise meaning for substantial evidence in the record. *Id.* at 224; *see also* ORS 183.482(8)(c). The second category includes "inexact terms" which constitute a complete expression of legislative policy. *Springfield*, 290 Or at 224. A court reviews the agency's actions pursuant to those terms as a matter of law to determine whether the agency's action effectuated the legislative policy, as evidenced by the text and context of the statute. *Id.* at 227-28; *see also* ORS 183.482(8)(a); *Coast Security Mortgage Corp. v. Real Estate Agency*, 331 Or 348, 353-54, 15 P3d 29 (2000) (illustrating process; identifying and construing inexact statutory term). The third category consists of "delegative terms," which the legislature uses when it intends to confer discretion on the agency to "refin[e] and execut[e] generally expressed legislative policy." *Springfield*, 290 Or at 228. When it is acting pursuant to a delegative term, an agency carries out a function that is "essentially legislative." *Id.* at 229. This court reviews a final order applying a delegative term as a matter of law to determine whether that decision "is within the range of discretion allowed by the more general policy of the statute." *Id.* at 229; *see also* ORS 183.482(8)(b)(A) (requiring remand if agency exercises discretion beyond range delegated by law).

The department argues that the phrase "reasonably necessary" is a delegative term that provides it with discretion to set fees in a manner that advances the generally expressed legislative policy of the inspection statute. Simplot disagrees, asserting that "reasonably necessary" is an inexact term. In our view, both parties focus too narrowly on the words "reasonably necessary," when the proper inquiry also must encompass the words that immediately follow: "to cover the cost of inspection and administration."

Viewed from that perspective, the phrase "reasonably necessary to cover the cost of inspection and administration" is not so general as to constitute a delegative term, because it does more than simply set a generally expressed legislative policy for the department to pursue. Instead, that phrase tells the department *how* to pursue the policy objective of funding an inspection program: It is to do so by setting fees that bear a defined relationship with the likely range of

costs for the program. The department may determine what the cost of inspection and administration likely will be, and then it must set the fees at a level that will "cover" those costs. Therefore, that phrase is an "inexact term" that expresses a complete legislative policy, and we review the department's action to determine whether it effectuated that policy.

The question remains whether the completed policy expressed in ORS 632.940 allowed the agency to set fees at a level that would allow it to establish a reserve fund. The text and context of ORS 632.940 contain several indications that a reserve fund is consistent with that policy. First, ORS 632.940 requires the department to set fees in an amount sufficient to cover the cost of "such inspection *and administration* of this section." (Emphasis added.) By explicitly referring to the costs of administration, the legislature indicated that revenue raised by fees need not be precisely tailored to the direct costs of inspection only. In creating a reserve for administrative contingencies, the department ensured that the indirect costs of administration, as well as the direct costs of inspection, were covered. Second, ORS 632.940 requires that all fees be "deposited in the Department of Agriculture Service Fund" and provides that the revenues in that fund shall be continuously appropriated to the department for the maintenance of the program. That provision effectively structures the program to be self-sustaining and therefore free from possible cash flow interruptions that might require legislative assistance. The state's fiscal year ends on June 30, at the start of the peak inspection season. At that moment, the department needs to have available the inspectors and administrative resources to perform the work that will produce revenues in the coming year. If the department were required to forego a reserve and narrowly tailor its fee intake in a particular year to its expenditures in that year, then the department would risk the very funding shortfalls that ORS 632.940 appears to be intended to guard against. Finally, ORS 632.940 specifically directs the department to "adjust" the fees to be collected. That implies that the revenue that the department raises through fees will not always remain at the exact level necessary to support the department. For all of those reasons, we conclude that the department's practice

of maintaining a reserve fund is consistent with the legislative policy behind ORS 632.940 and therefore is within the department's fee-setting authority under that statute.

In addition to challenging the *practice* of maintaining a reserve fund, Simplot challenges the *amount* of that reserve. As noted previously, the department determined that four months' operating costs was an appropriate reserve. Simplot advances no cogent argument that a four-month reserve is unreasonable or inconsistent with the legislative policy described above, and we are aware of none. In fact, as noted, that specific level was recommended as part of the department's cooperative agreement with the USDA. Although the amount of the reserve fluctuated above and below the target level, the record indicates that the department, as required by ORS 632.940, continually "adjust[ed]" the fees by increasing them to build the reserve when it was low and reducing them when the reserve was high. That practice also appears consistent with legislative policy.

B. *"Uniform Basis"*

■ Simplot also contends that the department erred because it did not assess fees on a "uniform basis," as required by ORS 632.940. As described previously, the department set separate fees for fresh pack inspections and processor inspections, setting fresh pack fees in cents per hundredweight, with minimum hourly rates, while setting processor fees in cents per hundredweight only. In Simplot's view, those separate fees were not "uniform."

■ We disagree. ORS 632.940 and ORS 632.945 recognize that the department may conduct different types of inspections and that the fees for inspections may vary. ORS 632.940, for example, provides that the department "may prescribe a different scale of fees for different localities" and "may prescribe a reasonable charge for traveling expenses and services when such services involve unusual cost * * *." Fresh pack inspections and processor inspections are fundamentally different processes that take place in different locations and involve examinations of product under different criteria. Because those two methods of inspection are not equivalent, there is no reason to think that their attendant fees should be. The context that ORS 632.940 and ORS

632.945 provide confirms that a fee structure is "uniform" when it specifies the same price for the same service. That is exactly what the department did in this case. Because Simplot paid the same price for inspection services as other recipients of equivalent services, Simplot paid a "uniform" fee. Therefore, the department did not commit legal error in determining that the fees were "uniform" as that term is used in ORS 632.940.

Finally, Simplot argues that the fresh pack inspection and processor inspection fees are not "uniform" because, as the final order found, "[h]istorically, the fees assessed and collected for the fresh inspections were less than the total direct cost of providing fresh product inspection, and the fees assessed and collected [for processor inspections] were more than the total direct cost of the [processor inspections]." In our view, that fact may show how difficult it was for the agency to match income to revenue needs, but, for the reasons that we have just described, it does not demonstrate that the fresh pack inspections and processor inspection fees were not uniform.

The decision of the Court of Appeals and the order of the Department of Agriculture are affirmed.