Argued and submitted March 10, affirmed November 8, 2006

## VICKERS/NELSON & ASSOCIATES, CONSTRUCTION PROGRAM MANAGEMENT, INC., *Petitioner,*

*v.*

## ENVIRONMENTAL QUALITY COMMISSION, *Respondent.*

### AQ/AB-NWR-02-181; A126168

148 P3d 917

David P. Meyer argued the cause for petitioner. With him on the briefs was David P. Meyer, P.C.

Judy Carol Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Linder and Wollheim, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

Petitioner Vickers/Nelson & Associates, Construction Program Management, Inc. (Vickers/Nelson) seeks review of a final order of the Environmental Quality Commission (the commission) that assessed a civil penalty against it under ORS 468A.715(1) for allowing an unlicensed contractor to perform asbestos abatement work at an elementary school. Vickers/Nelson contends that the Department of Environmental Quality (DEQ) rule implementing ORS 468A.715 (OAR 340-248-0010(33)) exceeds DEQ's statutory authority and that the imposition of a penalty based on that rule was error. Vickers/Nelson also asserts that the commission erred in excluding certain evidence that was offered at the contested case hearing. For the reasons that follow, we affirm.

On judicial review, Vickers/Nelson does not challenge the commission's factual findings.[1] Accordingly, we take the following facts from the commission's final order.

Vickers/Nelson is a project management company. In September 2001, Vickers/Nelson entered into a contract with Portland Public Schools (PPS) to provide project management services for the district's facility capital improvement program. The contract included renovation work at James John Elementary School. That renovation work involved removing and replacing sheet vinyl from the floor of the boys restroom in a modular classroom building.

As part of its agreement with PPS, Vickers/Nelson was designated an "owner's representative" for the school renovation project. PPS and Vickers/Nelson understood this to mean that Vickers/Nelson would act as an intermediary between PPS and the contractors hired to do renovation work. Questions from contractors were directed at Vickers/Nelson, and Vickers/Nelson would then communicate with

---

[1] In its reply brief, Vickers/Nelson contends that its assignment of error was broad enough to support "the argument that the ruling was erroneous based on both the invalidity of the rule (OAR 340-248-0010(33)) <u>and</u> the facts on which the conclusion was based." (Underscoring in original.) As <u>we</u> read Vickers/Nelson's brief, it argues only that the factual findings are insufficient to support the commission's ultimate legal conclusion, not that the factual findings themselves are erroneous.

PPS and respond to the contractors. PPS retained ultimate authority regarding the budget, scope of the project, and final scheduling issues.

One of Vickers/Nelson's responsibilities as owner representative was to solicit bids from qualified contractors. The invitation for bids was printed on Vickers/Nelson letterhead and explained that the bids should be returned to Vickers/Nelson. Following the bid process, PPS entered into a contract with Cedar Mill Construction Company (Cedar Mill). Cedar Mill, in turn, hired Addison Interiors (Addison) to remove the flooring in the boys restroom. Ultimately, Addison removed the flooring, despite concerns that the floor contained asbestos. When those concerns were confirmed through testing, the environmental coordinator for PPS contacted DEQ to report a potential asbestos problem at the school. After visiting the site, DEQ found that Addison had not properly packaged or labeled the asbestos-containing material that had been removed. DEQ then checked its databases and determined that Addison was not a licensed asbestos abatement contractor.

Subsequently, DEQ issued a Notice of Violation and Assessment of Civil Penalty in the amount of $7,200 against Vickers/Nelson for violation of ORS 468A.715(1) and OAR 340-248-0110(2). ORS 468A.715(1) provides that "an owner or operator of a facility containing asbestos shall require only licensed contractors to perform asbestos abatement projects." OAR 340-248-0110(2), which is among the administrative rules implementing Oregon's asbestos abatement project statutes, addresses the same subject matter as ORS 468A.715(1). OAR 340-248-0110(2) provides that "[a]n owner or operator of a facility may not allow any persons other than those employees of the facility owner or operator who are appropriately certified or a licensed asbestos abatement contractor to perform an asbestos abatement project in or on that facility." Vickers/Nelson requested a contested case hearing, and a hearing was held before an administrative law judge (ALJ).

The ALJ concluded that Vickers/Nelson was in fact "an owner or operator" of a facility containing asbestos. The

ALJ relied on the definition of "owner or operator" found in DEQ's implementing rules:

> " 'Owner or operator' means any person who owns, leases, operates, controls or supervises a facility being demolished or renovated or any person who owns, leases, operates, controls, or supervises the demolition or renovation operation, or both."

OAR 340-248-0010(33). The promulgation of that definition, the ALJ concluded, was within DEQ's authority, and the evidence established that Vickers/Nelson supervised and controlled the renovation project at the school.

The ALJ also made two evidentiary rulings that are relevant to our review. First, the ALJ ruled that references to the federal Asbestos Hazards Emergency Response Act (AHERA), 15 USC §§ 2641-2656, in an e-mail from the DEQ file in this case, were inadmissible. The ALJ concluded that AHERA, by its terms, applies only to schools and did not apply to Vickers/Nelson; because Vickers/Nelson—not PPS— was named in the Notice of Violation and Assessment of Civil Penalty, the references to AHERA were not relevant. Second, the ALJ excluded evidence relating to DEQ's treatment of a different company, Princeton Property Management, in a different proceeding. The ALJ excluded that evidence on the basis of relevance.

Vickers/Nelson then petitioned the commission to review the ALJ's order. The commission adopted the ALJ's findings of fact and conclusions of law and determined that, although "PPS owned and operated the school property," Vickers/Nelson "supervised and controlled the renovation project at the [school], and is thus an 'operator' " under OAR 340-248-0110(2). With respect to the ALJ's evidentiary rulings, the commission concluded that, "to the extent, if any, the documents have any technical relevance to the matter, the evidence would not change the findings of fact or conclusions of law even if accepted and considered in the manner most favorable to [Vickers/Nelson]." Vickers/Nelson now seeks review in this court.

In its first assignment of error, Vickers/Nelson argues that the commission erred in concluding that it was

an "operator of a facility" containing asbestos within the meaning of ORS 468A.715(1) and OAR 340-248-0010(33). Vickers/Nelson offers a number of related arguments centering on a common theme: the administrative rule defining "operator" to include someone who supervises or controls a renovation or demolition project—and the commission's application of that definition to Vickers/Nelson—exceeds the scope of authority granted by ORS 468A.715(1).

■ Whether an agency's action has exceeded its statutory authority depends, in part, on the nature of the terms used in the relevant statute. There are three categories of statutory terms, each of which invokes a particular type of appellate review. *Springfield Education Assn. v. School Dist.*, 290 Or 217, 621 P2d 547 (1980). The first category of terms includes "exact terms," terms that impart precise meanings so that their application involves only agency factfinding. We review an administrative order applying a term of precise meaning for substantial evidence in the record. *J. R. Simplot Co. v. Dept. of Agriculture*, 340 Or 188, 197, 131 P3d 162 (2006). The second category of terms includes "inexact terms." Inexact terms embody a complete expression of legislative policy. *Springfield Education Assn.*, 290 Or at 224. We review an agency's actions pursuant to those terms "as a matter of law to determine whether the agency's action effectuated the legislative policy, as evidenced by the text and context of the statute." *J. R. Simplot Co.*, 340 Or at 197. The third category consists of "delegative terms," which the legislature uses when it intends to confer discretion on the agency to refine and execute generally expressed legislative policy. *Springfield Education Assn.*, 290 Or at 228. An agency's actions pursuant to delegative terms are "essentially legislative," and we review a final order applying a delegative term as a matter of law to determine whether that decision "is within the range of discretion allowed by the more general policy of the statute." *Id.* at 229. Accordingly, our first task is to determine whether the phrase "operator of a facility" in ORS 468A.715(1) is an exact, inexact, or delegative term.

■ We observe first that the phrase "operator of a facility," when understood in the context of ORS 468A.715(1),

does not require DEQ to make any kind of policy determination of a legislative nature; thus, it is not a "delegative term." Nor is the phrase so precisely defined as to be an "exact term." *See Springfield Education Assn.*, 290 Or at 223 (exact terms "impart relatively precise meaning, e.g., 21 years of age, male, 30 days, Class II farmland, rodent, Marion County"). Rather, the phrase "operator of a facility" is an "inexact term" because, although parts of that phrase are defined by statute and embody a complete expression of legislative meaning, the phrase itself is open to various interpretations. *Coast Security Mortgage Corp. v. Real Estate Agency*, 331 Or 348, 354, 15 P3d 29 (2000) (inexact terms embody "a complete expression of legislative meaning" but are "open to various interpretations"); *Karjalainen v. Curtis Johnston & Pennywise, Inc.*, 208 Or App 674, 681, 146 P3d 336 (2006) (a term is "inexact" where its meaning is "not so precise as to require no interpretation at all"); *cf. Gambee v. Department of Forestry*, 191 Or App 241, 81 P3d 734 (2003), *rev den*, 336 Or 615 (2004) (the term "operator" as defined in ORS 527.620(13) is an inexact term). Because the statute involves the application of an inexact term, we review the commission's interpretation of that term as a matter of law to determine whether the agency's interpretation effectuated the statement of legislative policy. *J. R. Simplot Co.*, 340 Or at 197.

■    We begin, then, as we ordinarily do in matters of statutory construction, with the text and context of the relevant statute. *See Coast Security Mortgage Corp.*, 331 Or at 354-55 (applying statutory construction template of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993), to determine meaning of inexact statutory terms). The question before us is whether OAR 340-248-0010(33) impermissibly expands the meaning of the phrase "operator of a facility" in ORS 468A.715(1). The rule defines an "owner or operator" to include someone who "owns, leases, operates, controls or supervises a facility being demolished or renovated *or any person who owns, leases, operates, controls, or supervises the demolition or renovation operation*, or both." (Emphasis added.) The term "operator" is not defined by statute for purposes of ORS 468A.715(1), so we look to the ordinary meaning of that term. *Webster's Third New Int'l*

*Dictionary* 1581 (unabridged ed 2002) defines an "operator," in part, as "a person that actively operates a business (as a mine, a farm, or a store) whether as owner, lessor, or employee." To "operate" a business means to "manage and put or keep in operation whether with personal effort or not ‹operated a grocery store›." *Webster's* at 1581.[2]

The term "facility," unlike the term "operator," is defined by statute. " 'Facility' means all or part of any public or private building, structure, installation, equipment, vehicle or vessel, including but not limited to ships." ORS 468A.700(7). When the definitions of the terms "operator" and "facility" are read together as part of the text of ORS 468A.715(1), the statute could refer to the ongoing activities or operations that occur as part of the mission or purpose of the facility itself. For example, with respect to the operation of a school, the legislature may have intended the "operator" of the facility to be the operator of *school* operations, not the operator of renovation activities of the school building. Such a definition would serve to distinguish between the owner or operator of a demolition or renovation project *in* a facility and the owner or operator of the ordinary activities of the facility itself. Defining the words "operator of a facility" in that manner would mean that Vickers/Nelson would not be subject to ORS 468A.715(1).

The text and context of ORS 468A.715(1), however, are reasonably susceptible to another construction of the phrase "owner or operator of a facility." The definitions of the terms "operator" and "facility" could refer to an entity that manages a particular activity or operation *in* a public or private building, structure, installation, equipment, vehicle, or vessel. Under that construction of the statute, in the context of a facility undergoing a demolition or renovation project, the entity that controls the demolition or renovation is the "operator of the facility." Cf. *United States v. Geppert Bros., Inc.*, 638 F Supp 996, 999-1000 (ED Pa 1986) (stating, in the context of federal asbestos abatement legislation, that, "[a]lthough a demolition operation is an activity rather than

---

[2] To "manage," for relevant purposes, means to "direct or carry on business or affairs: SUPERVISE, ADMINISTER." *Webster's* at 1372.

an object, it is an activity that only occurs in relation to a particular object, in this case, the buildings being demolished. * * * The owner of the demolition operation is the owner of the building since it owns the source from which the pollution emanates.").

Such a construction of the phrase "operator of a facility" finds additional support in the statutory text of ORS 468A.715. Subsection (2) of the statute provides:

> "A facility owner or operator whose own employees maintain, repair, renovate or demolish the facility may allow the employees to work on asbestos abatement projects only if the employees comply with the training and certification requirements established under ORS 468A.730."

When read with ORS 468A.715(1), which provides that an owner or operator of a facility "shall require only licensed contractors to perform asbestos abatement projects[,]" the statute appears to presume that an "owner or an operator of a facility" can be someone in control of "asbestos abatement projects." A person who "owns, leases, operates, controls, or supervises the demolition or renovation operation," *i.e.*, the person in control of the demolition or renovation project, is in a position with the authority to require licensed contractors to perform asbestos abatement removal and would appear to be an "operator" as contemplated by ORS 468A.715(1).

The commission argues that, at the first level of statutory construction, we may consider certain federal statutes and regulations that provide additional context for ORS 468A.715(1). ORS 468A.715(1) is part of Oregon's air pollution laws—laws designed to "safeguard the air resources of the state by controlling, abating and preventing air pollution * * *." ORS 468A.015. At the time that ORS 468A.715(1) was enacted, the phrase "owner or operator" appeared in federal air pollution laws. The federal Clean Air Act authorized the Administrator of the Environmental Protection Agency (EPA) to promulgate standards for handling hazardous air pollutants, including asbestos. The Clean Air Act specifically provided that, for purposes of regulating hazardous air pollutants, "[t]he term 'owner or operator' means any person who owns, leases, operates, or supervises a stationary

source."[3] 42 USC §§ 7411(a)(5); 7412(a)(3) (1985). Pursuant to the Clean Air Act, the administrator promulgated rules concerning asbestos that required "each owner or operator of a demolition or renovation activity" to comply with EPA standards for demolition and renovation activity. 40 CFR § 61.145 (1985). Thus, at the time that ORS 468A.715 was enacted, the phrase "owner or operator of a stationary source" in federal regulations concerning asbestos abatement projects encompassed the "owner or operator of a renovation or demolition activity."

We need not resolve whether the federal statutes and regulations are properly considered at the first level of construction because, even if they are, they are not so illuminating as to render ORS 468A.715(1) susceptible to only one reasonable construction. We must therefore turn to the statute's legislative history. ORS 468A.715 was introduced as House Bill (HB) 2367 (1987). Initially, the bill provided that an "owner of a facility containing asbestos" would be responsible for the safe conduct of an asbestos abatement project in the facility. During a work session on the bill, one legislator asked whether it was intended to cover long-term lessors who, by contract, were required to make repairs on the property. Tape Recording, House Committee on Environment and Energy, HB 2367, Apr 1, 1987, Tape 80, Side A (statement of Rep Rocky Barilla). After some discussion of the topic, the director of DEQ indicated that the phrase "owner or operator" was used in other hazardous waste legislation to "pick up" anyone who has "functional responsibility for the facility." Tape Recording, House Committee on Environment and Energy, HB 2367, Apr 1, 1987, Tape 80, Side A (statement of Fred Hansen). The final version of the bill included the "owner or operator" language suggested by the director of DEQ. Or Laws 1987, ch 741, § 6. Thus, the legislative history tends to support the commission's argument that the legislature intended that entities like Vickers/Nelson—who managed or controlled an asbestos abatement project in a facility—would be subject to the provisions of ORS 468A.715(1)

---

[3] A "stationary source" was defined as "any building, structure, facility, or installation which emits or may emit any air pollutant." 42 USC § 7411(3) (1985).

because they would have "functional responsibility" for asbestos removal.[4]

■    Nonetheless, if petitioner is correct that the legislature intended the word "operator" in the statute to refer only to the operator of the ongoing activities related to the mission or purpose of the facility, then the only entity in this case that has "functional responsibility" for the school facility is PPS. For that reason, we are not persuaded that the text, context, and legislative history of ORS 468A.715(1) are determinative regarding the legislature's intent. We therefore resort to the third level of statutory construction: "general maxims of statutory construction." *PGE*, 317 Or at 612. Among those maxims is the principle that, "where no legislative history exists, the court will attempt to determine how the legislature would have intended the statute to be applied had it considered the issue." *Id.*

    We believe that, had the 1987 legislature been confronted with the issue before us, it would have intended a meaning for the words "operator of a facility" in ORS 468A.715(1) that would have included persons who control a demolition or renovation operation at the facility. We reach that conclusion for three interrelated reasons. First, the legislative history reveals that the "or operator" language was inserted to "pick up" individuals who have "functional responsibility" for the facility. Tape Recording, House Committee on Environment and Energy, HB 2367, Apr 1, 1987, Tape 80, Side A (statement of Fred Hansen). In the case of a demolition and renovation project, "functional responsibility" rests, at least in part, with the person controlling the demolition and renovation operations.

---

[4] The commission, relying on, among other things, testimony before the House Committee on Environment and Energy by Walter Jaspers, the Asbestos Coordinator for the EPA, argues that the "Oregon statute was modeled on the federal [asbestos abatement legislation]." However, the commission has not provided, and we are not aware of, legislative history that indicates that the "owner or operator" language was intended to incorporate the meaning of the phrase "owner or operator" in federal statutes and regulations. As discussed above, the "or operator" language appears to have been an effort to answer a question regarding a group of individuals—long-term lessors—who would have had an interest in maintaining or making repairs to a facility but who were not "owners" of the property.

Second, as expressed by the legislature, the general purpose of the asbestos abatement project statutes was to "reduce exposure to asbestos caused by improperly performed asbestos abatement projects through the upgrading of contractor and worker knowledge, skill and competence." ORS 468A.705(6). The statutory scheme attempts to accomplish that goal by (1) ensuring that persons who carry out asbestos abatement projects are properly licensed or certified, ORS 468A.710; ORS 468A.715(2), and (2) ensuring that persons who require others to carry out those projects hire or employ only individuals who have been properly licensed or certified, ORS 468A.715(1), (2). A construction of the phrase "operator of a facility" that requires those *in control of demolition or renovation operations in a facility* to ensure that properly trained or certified individuals work on an asbestos abatement project is consonant with the intended operation of the statutory scheme as a whole.

Finally, the legislature recognized that the asbestos abatement project statutes were part of a larger, nationwide effort to protect the public from the dangers of asbestos. Specifically, the legislature was aware of federal legislation on the subject of asbestos abatement, *see* Testimony, House Committee on Environment and Energy, HB 2367, Feb 25, 1987, Ex C (statement of Walter Jaspers), and was aware that the phrase "owner and operator" had been used in other hazardous waste legislation, *see* Tape Recording, House Committee on Environment and Energy, HB 2367, Apr 1, 1987, Tape 80, Side A (statement of Fred Hansen). Given that broader statutory context, we conclude that it is likely that the legislature would have intended a construction of the phrase "owner or operator of a facility" that is consistent with the use of an analogous term in federal asbestos abatement legislation.[5] For all of the above reasons, we conclude that DEQ did not exceed its statutory authority in defining an "owner or operator of a facility" to include a person who controls the "demolition or renovation operation * * *." OAR 340-248-0010(33).

---

[5] As noted above, at the time that ORS 468A.715(1) was enacted, the phrase "owner or operator" of a stationary source in federal legislation was construed broadly to encompass the operator of a demolition or renovation project. *See Geppert Bros., Inc.*, 638 F Supp at 999.

■ The question, then, is whether the commission's order—which stated that "Vickers/Nelson supervised and controlled the renovation project at the [school], and is thus an 'operator' under the Department's rules"—is supported by substantial evidence. According to Vickers/Nelson, there is no evidence that it had control over the renovation operation "based on the undisputed finding that Vickers/Nelson simply was an 'owner's representative' and 'go between.' " We disagree. The record contains evidence that Vickers/Nelson solicited bids for the project and that the bids were sent to Vickers/Nelson's office; that all questions from contractors went to Vickers/Nelson; and that Vickers/Nelson exercised the power to "shut down the site" until the extent of asbestos contamination could be determined. Given those facts, we conclude that the commission's finding that Vickers/Nelson supervised and controlled the renovation operation is supported by substantial evidence.

■ In its second assignment of error, Vickers/Nelson argues that the commission erred when it excluded from evidence certain references to AHERA in one of Vickers/Nelson's exhibits. The AHERA requirements, Vickers/Nelson argues, were admissible to establish nondelegable duties imposed on PPS as the owner and operator of the school. However, Vickers/Nelson's obligations under ORS 468A.715 are independent of any federal obligations imposed on PPS. Said another way, even if PPS could not delegate its duties to Vickers/Nelson under federal law, nothing prohibits Oregon from imposing separate asbestos-related obligations on Vickers/Nelson as an "operator of the facility" for purposes of ORS 468A.715. Accordingly, we agree with the commission that PPS's obligations under AHERA were not relevant to whether Vickers/Nelson violated ORS 468A.715.

In its third assignment of error, Vickers/Nelson contends that the commission erred in excluding two exhibits concerning the commission's treatment of Princeton Property Management (Princeton). According to Vickers/Nelson, the Princeton documents were relevant to establish the commission's "inconsistency with prior agency practice." However, the Princeton documents establish that Princeton, too, was determined to be in violation of ORS 468A.715. We perceive no inconsistency in the commission's treatment of the two

companies. For that reason, we reject Vickers/Nelson's third assignment of error.[6]

Affirmed.

---

[6] We further note that, given the commission's statement that, "to the extent, if any, the documents have any technical relevance to the matter, the evidence would not change the findings of fact or conclusions of law even if accepted and considered in the manner most favorable to [Vickers/Nelson]," any error in the admission of the evidence may be harmless. That is, even if we were to conclude that the evidence should have been admitted, it would appear that Vickers/Nelson has not been prejudiced because the excluded evidence would not have affected the commission's decision in any event.